Raye DINNERSTEIN, Executrix of the Estate of Howard Dinnerstein, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

No. 3, Docket 72–2270.

United States Court of Appeals, Second Circuit.

Argued Sept. 21, 1973.

Decided Oct. 16, 1973.

Paul J. Falsey, New Haven, Conn. (Gold, Gold & Bernblum, Milton A. Bernblum, New Haven, Conn., of counsel), for plaintiff-appellee.

Thomas F. Maxwell, Jr., Asst. U. S. Atty. (Stewart H. Jones, U. S. Atty., D. Conn., of counsel), for defendant-appellant.

Before KAUFMAN, Chief Judge, and SMITH and MULLIGAN, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This action arose out of the suicide of plaintiff's husband while a patient at the Veterans Administration Hospital in West Haven, Connecticut.[1] The only question on appeal is the validity of the district court's finding that the hospital officials and staff were negligent in permitting Mr. Dinnerstein's death. Both parties agree that under the Tort Claims Act, Connecticut law applies, and that under that law the proper standard of care is that standard which other hospitals in the area have and afford similar patients. The parties disagree, however, as to whether the evidence presented at trial—most notably the expert psychiatric testimony—sufficiently supports the court's finding of negligence. Since we find the evidence to be sufficient, we affirm.

I.

For as long as six years before his death on January 4, 1969, Howard Dinnerstein had suffered recurrent periods of depression serious enough to require voluntary psychiatric care. On January 31, 1968, he ran his car into a highway bridge abutment. Though little damage was done to the car and none to himself, Dinnerstein told his wife that the "accident" had actually been a suicide attempt. The same day he was admitted —again voluntarily—to the V.A. Hospital in West Haven; he remained there under observation until February 12.

1. The government has never disputed that Dinnerstein's fall was a suicide.

The hospital records indicate that at the time its staff doctors considered Dinnerstein a "suicide risk." Though the records also indicate that Dinnerstein was gradually accorded greater freedom of movement—from complete restriction on January 31 to full privileges on February 2—his release on February 12 was nevertheless "against medical advice."

In the fall of 1968, business pressures apparently drove Dinnerstein back into his depression. Dr. Gottlieb, Dinnerstein's new private psychiatrist, convinced him to admit himself to St. Raphael's Hospital in New Haven on November 5, 1968. Dr. Gottlieb testified that his reasons for hospitalizing Dinnerstein in November included protecting him from possible suicide. On November 9, Dinnerstein's condition took a turn for the worse: He would not leave his bed nor do anything for himself. However, by November 14 he had improved enough to be granted walking privileges; and on November 28, he was again discharged.

But in December the cycle again turned downward, and Dinnerstein was treated by Dr. Gottlieb no less than seven times. As he was going steadily downhill, Dr. Gottlieb again recommended hospitalization. At the V.A. Hospital, the physician on duty, Dr. Talan, informed Dinnerstein that the individual therapy he was seeking was not available. Depressed further by this, Dinnerstein refused to admit himself. However, on the following day, January 3, 1969, he decided to accept the V.A. offer of group therapy. During the admission session, Dr. Clark of the V.A. staff diagnosed Dinnerstein's condition as a "Depressive Reaction." However, he later testified that he did not consider Dinnerstein to be suicidal.

Though Dr. Clark was aware of Dinnerstein's prior history from both the V.A. records of his February hospitalization and from a telephone conversation between Dr. Talan and Dr. Gottlieb on January 2, he did not order any restrictions or special supervision for Dinnerstein in assigning him to a seventh-floor ward. Dr. Clark also discontinued a regime of anti-depressant drugs Dinnerstein had followed up to that time in order to obtain a more accurate reading of his psychological state.

The V.A. records indicate that on the evening of January 3, Dinnerstein complained to Dr. Clark that he had become even more depressed since arriving at the hospital because of the inadequacy of the group therapy program. However, despite these complaints, Dr. Clark issued no additional orders either to supervise Dinnerstein more closely or to give him anti-depressant medication. At approximately 3:00 p. m. on the following day, January 4, Dinnerstein walked to the lavatory on the seventh floor and leaped to his death from an unsecured window.

## II.

 The government's first contention is that as a matter of Connecticut law, the district court's finding of negligence cannot stand because no psychiatric expert testified that the appropriate standard of medical care was not satisfied. This argument misstates the law. Rather it is clear that expert medical testimony is necessary only to provide the trier of fact with the proper standard of medical care against which to measure the defendant's actions. It is the trier of fact, and not the expert witness, who must then evaluate the evidence to determine whether or not that standard was actually met. Slimak v. Foster, 106 Conn. 366, 370–71, 138 A. 153, 155 (1927). Indeed, the trier of fact may even base a finding of negligence on the expert testimony of the defendant-doctor. Snyder v. Pantaleo, 143 Conn. 290, 294, 122 A.2d 21, 24 (1956); Allen v. Giuliano, 144 Conn. 573, 575, 135 A.2d 904, 906 (1957); Console v. Nickou, 156 Conn. 268, 274, 240 A.2d 895, 898 (1968); Levett v. Etkind, 158 Conn. 567, 575, 265 A.2d 70, 73 (1969).

Here there was clear testimony from three psychiatric experts—Dr. Gottlieb, Dr. Talan, and Dr. Rubenstein, a government witness—that the hospital

should have restricted Dinnerstein *if* there was reason to believe he was suicidal. Indeed, this standard of care is so obvious that expert testimony seems hardly necessary.

Nevertheless, when one remembers the fact that unlike blood pressures or pulse rates, emotional states cannot be calibrated with precision, medical expertise again becomes relevant. That is, the question for expert guidance—but still for ultimate determination by the trier of fact—was whether it was reasonably foreseeable on the basis of Dinnerstein's prior history that he would commit suicide. The government correctly notes that all of the expert witnesses, including Dr. Gottlieb, testified that they did not consider Dinnerstein to be suicidal on his admission to the hospital. However, despite this testimony on the narrow question of whether Dinnerstein exhibited suicidal tendencies on the day he was admitted, the trial court—relying primarily on the hospital's own records and the conversations between Dr. Gottlieb and Dr. Talan—nevertheless found:

[T]hat the Hospital knew or should have known of the real possibility of a suicide attempt, that it failed to take appropriate measures to guard Dinnerstein against that danger, that it was its duty to do so, and that, having failed to act with due care in the discharge of that duty, the United States is liable to the plaintiff for the losses caused thereby. . . .

At the least, for the first few days of Dinnerstein's admission his movements should have been restricted so that he could be closely watched. As he was assigned to a ward on the seventh floor, measures should have been taken to see that he could not jump from a window. His own denial upon admission of suicidal ideation and even Dr. Gottlieb's belief that he was not imminently suicidal, cannot excuse the complete absence of precautions to insure the safety of a patient with a suicidal gesture in his past, a long history of psychiatric treatment for recurrent and severe depression, previous hospitalization to protect against possible suicide. . . .

■ In our review of this finding, the government urges that we reconsider the evidence unrestrained by the "clearly erroneous" test of Rule 52(a).[2] How-

---

2. The government cites Mamiye Bros. v. Barber Steamship Lines, Inc., 360 F.2d 774 (2d Cir. 1966), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966), for the proposition that our review of this finding of negligence must also be free of the clearly erroneous rule in order to insure a uniformity of result among the several courts in this circuit. However, *Mamiye Bros.* applied only where contrary decisions rest "on exactly the same facts. . . ." *Id.* at 777.

Baker v. United States, 226 F.Supp. 129 (S.D.Iowa 1964), aff'd 343 F.2d 222 (8th Cir. 1965), cited by the government, while strikingly similar to the case at bar does not satisfy this test. In *Baker* the patient, who had been referred to a V. A. hospital by a private physician who had noted suicidal tendencies, was also assigned to an open ward after a V. A. doctor concluded he was not a suicide risk. Three days later, Baker left his ward and jumped into a open well on the hospital grounds. The trial judge, noting that modern psychiatric theory requires some "calculated risks," found no negligence, and the Eighth Circuit affirmed.

Assuming, *arguendo*, that we must reconcile our result here with *Baker*, a case from another circuit which may or may not be correct, there is one important point of distinction between the two sets of facts. In *Baker*, there is no suggestion that hospital officials had any reason to believe the patient's psychological condition was further deteriorating after his initial admission examination. Here, by contrast, it is undisputed that Dinnerstein told Dr. Clark that he was becoming even more depressed—apparently due to the lack of either individual therapy or anti-depressant medication, or both.

Two other federal decisions finding no negligence in the suicides of government patients are similarly distinguishable by the fact that in both there was no evidence of recent suicide tendencies or attempts. *See,* White v. United States, 244 F.Supp. 127, 129–131 (E.D.Va.1965), aff'd, 359 F.2d 989 (4th Cir. 1966) (last suicidal "gesture" occurred fourteen years before actual suicide; the Fourth Circuit held that the finding of non-negligence, while "highly debatable," was not reversible) ; Frederic v. United States,

ever, while we agree that a finding of negligence is reviewable as a matter of law, we cannot accept the government's invitation to conduct a broad, almost *de novo*, inquiry into the basic facts of this case. As we have previously stated:

> The standard of review to be applied to a district court's finding of negligence is not the "clearly erroneous" standard . . . for a finding of negligence is reviewable as a matter of law. Nevertheless, the lower court finding "[will] ordinarily stand unless the [lower] court manifests an incorrect conception of the applicable law." Cleary v. United States Lines Co., 411 F.2d 1009 (2 Cir. June 2, 1969), citing Radovich v. Cunard Steamship Co., 364 F.2d 149, 152 (2 Cir. 1966) and Esso Standard Oil S. A. v. S.S. Gasbras Sul., 387 F. 2d 573 (2 Cir.), cert. denied, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968).

Hendry v. United States, 418 F.2d 774, 784 (2d Cir. 1969).

■ Here there is no doubt that the trial court applied the proper legal standard: If Dinnerstein's suicide was reasonably foreseeable, the hospital staff was clearly negligent in assigning him to an unsupervised and unrestricted room on the seventh floor.

■ We further hold that even without the benefit of the clearly erroneous rule, the finding that Dinnerstein's suicide was sufficiently foreseeable to demand greater supervision is amply supported by the record. The hospital officials should certainly have been aware of Dinnerstein's prior hospitalization history contained in their own records. Similarly, Dr. Gottlieb, who testified that he considered Dinnerstein's condition in late December to be the same or worse than it was in November when he was hospitalized partially to prevent a suicide attempt, informed Dr. Talan that Dinnerstein had exhibited "negativism and unpredictability" as recently as November 9th. This diagnosis certainly should have been made available to Dr. Clark, the admitting physician.

Moreover, Dr. Clark himself admitted that soon after his admission, Dinnerstein expressed dissatisfaction and further depression with the treatment he was receiving. Yet despite these complaints, Dr. Clark continued to deprive Dinnerstein of anti-depressant drugs he had been receiving, so as to evaluate his psychological condition.

From these facts, when combined with a six-year history of deepening depression, it was not at all unreasonable for the trial court to conclude that Dinnerstein should have been supervised more closely. This is not to suggest that every potential suicide must be locked in a padded cell. The law and modern psychiatry have now both come to the belated conclusion that an overly restrictive environment can be as destructive as an overly permissive one.[3] But while we must accept some calculated risks in order to insure the patient's legal rights and provide him with the most effective therapy,[4] we must also admit that errors in judgment do occur and that when they do, medical authorities must assume their rightful share of the responsibility.[5] Here, in short, we can-

---

246 F.Supp. 368, 371 (E.D.La.1965) (patient, hospitalized for non-psychiatric reasons, had never previously attempted nor threatened suicide).

3. *See, e. g.*, Perr, Suicide Responsibility of Hospital and Psychiatrist, 9 Clev.-Mar. L.R. 427, 439–40 (1960).

4. *See, generally*, B. Ennis, Prisoners of Psychiatry (1972); T. Szasz, Law, Liberty and Psychiatry (1963); Note, Civil Commitment of the Mentally Ill: Theories and Proce-

dures, 79 Harv.L.R. 1288 (1966). *Cf.* Jackson v. Indiana, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) (due process standards applied to competency statutes).

5. *See*, Lucy Webb Hayes National Training School for Deaconesses and Missionaries v. Perotti, 136 U.S.App.D.C. 122, 419 F.2d 704, 707–708 (1969) (Bazelon, C. J.):

> The mental hospital functions in this new model as a repair shop rather than as a human junkyard. Confinement and physical

not say the trial court erred in concluding that the hospital staff was negligent in allowing Dinnerstein—an emotional unknown quantity—unrestricted movement on the seventh floor.

The judgment is affirmed.

restraint are no longer the defining qualities of hospitalization. Since the emphasis is upon treatment, the atmosphere of the hospital should encourage recovery by allowing the patient to assume progressively greater and greater responsibility.

Since confinement and restraint may deny the patient the sense of responsibility and self-control essential to his recovery, the argument runs, limitations upon his freedom of movement are appropriate only when necessary for the safety of the patient or others. And since the restraint required for absolute safety may be inconsistent with effective therapy, calculated risks must sometimes be taken.

. . . Real challenges and real responsibility for the patient imply the risk of real failures, however. Some patients will prove unready for responsibility, and may injure themselves or others. In a real sense these failures are the inevitable cost of any treatment program oriented toward returning patients to the community. But the law nevertheless must allocate at least the economic losses occasioned thereby.