Elmira SMITH, Administratrix of the Estate of Gary Smith, Deceased et al.

v.

UNITED STATES of America.

Civ. A. No. 73–2383.

United States District Court,
E. D. Pennsylvania.

Sept. 27, 1977.

Louis S. Fine, Philadelphia, Pa., for plaintiff.

Alexander Ewing, Jr., Asst. U.S. Atty., Philadelphia, Pa., for U.S.

## MEMORANDUM AND ORDER

JOHN MORGAN DAVIS, Senior District Judge.

■ This action was brought by the widow and children of a deceased veteran who was killed when he threw himself in front of a train while on an unauthorized absence from a Veterans Administration Psychiatric Hospital. Plaintiffs claim that their decedent's death was directly caused by the negligence of defendant in 1) the inappropriate treatment decedent received while under Government psychiatric care, which prevented him from overcoming his illness, and 2) the allowance by defendant's personnel of decedent to have enough freedom of movement to escape the hospital while in a suicidal state of mind. Plaintiffs brought this suit under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq.[1] We are called upon to make findings of fact and conclusions of law after a non-jury trial. While we do not believe plaintiffs have proven that their decedent would have, or ever could have led a normal productive life had he been proffered different treatment, we do believe that the negligence of Veterans Administration employees proximately caused decedent's death, and we therefore find accordingly.

---

1. Under this Statute the Law of the place where the Act or omission occurred is to be applied. 28 U.S.C. § 1346(b). Therefore we will apply Pennsylvania law to determine the law of the case.

## FINDINGS OF FACT

1. Gary Smith served in the United States Army from April 8, 1964 to May 13, 1966 and then was honorably discharged with a 30% disability. (Stipulation Par. 1).

2. During his service in the Army, Gary Smith developed an emotional illness diagnosed as schizophrenic reaction, paranoid type, acute moderate. (Stipulation Par. 2–5).

3. On June 29, 1966 Gary Smith applied for V.A. out-patient treatment claiming treatment for nervous condition and headaches. (Stipulation Par. 6).

4. During the period from September 21, 1966 to January 25, 1967, Gary Smith was examined by several Veterans Administration psychiatrists and psychologists who confirmed the original diagnosis of paranoid schizophrenia. (Stipulation Par. 7–11).

5. On January 25, 1967, Gary Smith was admitted to the V.A. Hospital at Coatesville, Pennsylvania for the first time as an in-patient. (Stipulation Par. 12).

6. From January 25, 1967 until his death on January 17, 1973, Gary Smith was admitted to the Coatesville Veterans Hospital on twelve (12) separate occasions. He was never officially released, but absconded whenever given the opportunity to do so. (Stipulation Par. 12–170).

7. Because of his poor medical progress, Gary Smith was considered to be unfit for vocational rehabilitation. (Stipulation Par. 32).

8. On February 28, 1969 Gary Smith was examined by Dr. Sandra Zimmerman, PH.D. psychologist who recommended vocational training and suggested Gary Smith be tested for this purpose as soon as feasible. (Stipulation Par. 46).

9. On July 28, 1969 Dr. Zimmerman reported that Gary Smith constantly failed to report when scheduled for vocational testing, and finally went AWOL from the hospital. (Stipulation Par. 59).

10. Sometime between July 3, 1969 and June 29, 1971, Gary Smith became addicted to the drug Doriden which he was being given to enable him to sleep. (Stipulation Par. 60–90).

11. During this period V.A. doctors noticed that Gary Smith was becoming dependent on the drug, and often refused his demands for it, or prescribed it in small quantities. (Stipulation Par. 65–88).

12. For additional Doriden, Gary Smith went to two other doctors. He was therefore able to get enough of the drug to take 3 tablets of 500 Mgm. Doriden every night. (Stipulation Par. 91).

13. Gary and Elmira Smith were married in May of 1970. (N.T. 168).

14. On June 29, 1971, Gary Smith stated in an application for hospital treatment that his marital status was "single" and that the person to be notified in an emergency was Evelyn Smith, his mother. (G–1).

15. On October 21, 1971, Gary Smith stated in an application for hospital treatment that his marital status was "separated". (G–2).

16. On March 30, 1972, Gary Smith stated in an application for hospital treatment that his marital status was "separated". (G–2).

17. On August 9, 1972, Gary Smith was admitted to Salt Lake City V.A. hospital in Salt Lake City, Utah. (Stipulation Par. 146).

18. On August 9, 1972, Gary Smith stated in an application for medical benefits that he went to Salt Lake City because he, "had to get away from wife and family." (G–2).

19. As time progressed Gary Smith spent more and more time in the hospital. It is probable that he would have spent more time in the hospital had he lived. (N.T. 471).

20. Gary Smith attempted or threatened to commit suicide on at least three (3) occasions: September 11, 1971, with an overdose of Doriden; October 22, 1971, when he threatened to kill himself; and March 28, 1972 when he attempted to jump out of a

window. (N.T. 204; Stipulations Par. 53, 57, 69). In December, 1972 he threatened to kill himself.

21. On December 13, 1972 Gary Smith was taken to the Albert Einstein Medical Center by police. On intake it was noted by Dr. M. Barusewycz, M.D.: "PT was brought here P.I.C.V. by police, his wife and his mother since he was threatening to kill himself or his wife." (Stipulation Par. 154).

22. On December 15, 1972 while at AEMC it was noted: "Mr. Smith physically assaulted another male patient in the men's bathroom . . ." (Stipulation Par. 155).

23. On December 15, 1972 Gary Smith was transferred back to Coatesville. On intake Nurse Gattuso noted: "Return from U.A. transf. today from Albert Einstein. PT was taken there because he was threatening to harm himself or his wife. Admits to hearing voices. Inappropriate smiling. Placed on E.E." (Stipulation Par. 156).

24. On December 15, 1972 at 3:30 P.M. Nurse Gattuso noted: "PT pushed the television off the table onto the floor. PT states the television was saying things he didn't want to hear. Calm and quiet now." (Stipulation Par. 257).

25. On December 18, 1972 it was noted: "Trying to start a 'fight' with anyone whom he can 'goat' (sic) into it. Sedated and secluded." (Stipulation Par. 258).

26. On December 19, 1972 Nurse Gattuso noted: "PT Coleman reported that Gary Smith has struck him 4 times in the past day. Last blow occurred at 1:30 P.M. Sedation given. Mr. Smith continued to be agitated. Placed in seclusion (a) 1:45 P.M. to allow PT to gain control." (Stipulation Par. 159).

27. It was also noted on December 19, 1972 that patient was "still agitated ready to fight anyone back in seclusion 5 P.M.–7 P.M." (Stipulation Par. 160).

28. On December 24, 1972 it was noted by Nathaniel Bookman, N.A.: "PT was out in the hallway for coke break and during that time he remove (sic) some of the xmas decorations and threw them in the trash can." (Stipulation Par. 161).

29. On December 25, 1972 it was noted by Brady Treadwell, N.A.: "PT picked up PT Bruce Hollins radio and threw it on the floor and broke it." (Stipulation Par. 162).

30. On December 29, 1972 Nurse Gattuso noted: "1:00 P.M. Mr. Smith is very quiet on the ward. He does admit to hearing voices that say bad things and gives this as the reasons he destroys televisions and radios. Was striking out at another PT several times. Views himself as having no future stated this morning he fears his wife is going out with another man. Appetite is good. 3:30 struck PT Ed Erwin states Mr. Erwin was provoking him. Sedation given." (Stipulation Par. 163).

31. On December 30, 1972 Nurse Simmons noted: "Struck PT Erwin. Said he was being provoked but refused to say how." (Stipulation Par. 164).

32. On January 4, 1973 Nurse Hopkins noted: "Striking out at others for no apparent reason. Placed in seclusion for 1 hr." (Stipulation 165).

33. On January 8, 1973 Nathaniel Bookman. N.A. noted: "I was taking another PT BP in the east end dorm and this PT (Smith) was in bed, appeared to be asleep, about that time the PT got out of bed walked out of the dorm very quietly to the day room, a minute later I heard a loud noise, I rushed to the day room and by that time the PT had picked up the radio and threw it to the floor." (Stipulation Par. 166).

34. On January 9, 1973 Nurse Reeder noted: "Agitated this A.M. medicated for same. 9:00 A.M. placed in seclusion because attempt to strike out (a) others . ." (Stipulation Par. 167).

35. On January 10, 1973 Nurse Gattuso noted: "Agitated throwing chairs sedation given. Seclusion." (Stipulation Par. 168).

36. On January 17, 1973 Nurse Gattuso noted: "PT continues to be quiet. Has been cooperative-pleasant. Staff feels he can be tried on privileges. Transf. to WE with 1–4:30 privileges." (Stipulation Par. 169).

37. At 5:30 P.M. Gary Smith was listed as unauthorized absence from privileges. (Stipulation Par. 170).

38. At 5:00 P.M. Gary Smith jumped in front of a west bound Penn Central Freight train and was killed. (Stipulation Par. 171).

39. Dr. Robert DeSilverio is a certified psychiatrist. He is on the faculty of Hahnemann Medical College. (N.T. 92).

40. Dr. DeSilverio confirmed that based on the defendant's medical records, the decedent Gary Smith was not examined by a physician from January 10, 1973, to January 17, 1973. (N.T. 95).

41. Dr. DeSilverio confirmed that through the latter part of December through January 10, 1973, the decedent Gary Smith manifested impulsive, aggressive, assaultive behavior. (N.T. 96).

42. Impulsive behavior is aggressive behavior with little premeditation. It is an impulsive act rather than a planned act. (N.T. 96).

43. A person such as Gary Smith who displayed such impulsive behavior could not be trusted. There was no telling what he would do. He could harm himself or others on an impulse. (N.T. 96).

44. Gary Smith was impulsive during his last hospitalization at Coatesville prior to his death on January 17, 1973. (N.T. 95, 96, 97).

45. Just prior to his last hospitalization at Coatesville, Gary Smith had threatened to kill himself. He had also attempted suicide on three prior occasions. (*Supra*, and N.T. 97, 98).

46. Based on his record of attempted suicides and his impulsive behavior during his last hospitalization, Gary Smith should have been considered a suicide threat but he was not so considered at Coatesville Veterans Hospital. (N.T. 98).

47. Gary Smith was last observed to be impulsive and aggressive January 10, 1973. The accepted standard of medical care in the community at that time would have required behavior of Gary free from any impulsive inclinations for two to three weeks before transfer from locked ward to more open facilities. (N.T. 98, 99).

48. Gary was transferred to open facilities from the closed ward January 17, 1973, the day he died. This was only one week from the last manifestation of impulsive inclinations on January 10, 1973 and was premature. (N.T. 99).

49. Prior to releasing Gary from the locked ward on January 17, 1973, the accepted standard of care required Gary be evaluated by a psychiatrist. (N.T. 99). The purpose of this evaluation would be to determine whether he was sufficiently free from impulsive inclinations. (N.T. 100).

50. A proper, thorough, complete evaluation by a psychiatrist of Gary on January 17, 1973 would have detected the impulsive inclinations which caused Gary to commit suicide on January 17, 1973 and Gary would not have been granted open privileges and could not have killed himself on January 17, 1973. (N.T. 100, 101).

51. The fact that Gary Smith on January 17, 1973 within hours of being granted open privileges, did step in front of a train and committed suicide establishes that Gary Smith was either not evaluated prior to release or the evaluation was incomplete. (N.T. 101).

52. Gary Smith worked for a few months in 1966 at York's Department store in Philadelphia. (N.T. 44).

53. Gary Smith also had a job at Campbell Soup Company in 1966 which was only part-time work and lasted only during the tomato season. (N.T. 44).

54. Gary Smith worked for the post office during one Christmas season. (N.T. 45).

55. Evelyn Smith testified that Gary Smith worked at his three jobs for maybe a few months. (N.T. 165).

56. Gary Smith received a VA disability check of $562.00 in January, 1973, the last month of his life. (N.T. 54).

57. As of February, 1973, Gary Smith's family began receiving VA benefits of $250.00 per month. (N.T. 57).

58. On May 1, 1974, if Gary Smith had been living his monthly VA disability check would have been $661.00. On that date Gary Smith's family began receiving $293.00 in monthly VA benefits. (N.T. 59).

59. On August 1, 1975, if Gary Smith had been living his monthly VA disability check would have been $740.00. On that date Gary Smith's family began receiving $328.00 in monthly VA benefits. (N.T. 66).

60. On October 1, 1976, if Gary Smith had been living his monthly VA disability check would have been $799.00. On that date Gary Smith's family began receiving $354.00 per month in VA benefits. (N.T. 60).

61. Gary Smith's children and wife are eligible for VA education benefits for their college and professional training. (N.T. 67–70).

62. Elmira Smith receives $218.00 a month in Social Security death benefits as a result of her husband's death. (N.T. 261).

63. The loss of past veterans benefits differential is $11,644.00.

64. The loss of future veterans benefits differential reduced to present value is $12,108.00.

65. The funeral bill was $1500.00. (N.T. 582).

## DISCUSSION

There are two issues requiring resolution for the determination of this action: 1) was the treatment decedent received during his long mental illness inappropriate, leading to a prolongation of his problem and his eventual suicide; and 2) were the personnel of the Coatesville Veterans Hospital negligent in allowing decedent freedom of movement within the hospital grounds, rather than keeping him in a locked ward, and did this negligence proximately cause his death.

▆ The first issue may be dealt with perfunctorily. It is clear from the record that plaintiffs did not meet their burden of proving that the care which their decedent received while in the custody of the Veterans Administration was not within the accepted standards of medical practice of the Philadelphia area at the time it was tendered. In fact, considering decedent's initial unwillingness to admit to his illness, his refusal to cooperate with his psychiatrists in their treatment of him,[2] and his using of his illness as a vehicle for obtaining drugs, there is little wonder that decedent showed no progress over a period of nearly seven years. Assuming that decedent's mental disease was treatable, he had no one to blame but himself for his lack of improvement.

Plaintiff's second argument, presents a much more interesting and difficult question—a question which apparently has never been approached either by the courts of the Commonwealth of Pennsylvania, or the Federal courts therein. The question simply stated is, does a psychiatric hospital have a duty to prevent the escape or acquisition of dangerous devices by its suicidal patients, and, having breached that duty is the hospital liable for damages its patients cause either to themselves or to others?

While there may be a dearth of local case law in this area, the matter has been discussed on several occasions elsewhere. The leading case appears to be *Dinnerstein v. U. S.*, 486 F.2d 34 (2d Cir. 1973), a case arising out of the second circuit on a set of facts remarkably similar to those we encounter here. In that case, a veteran with a long history of mental illness, and at least one suicide attempt, was admitted to a veterans hospital suffering from "depressive reaction." He was not considered suicidal by the hospital staff, despite his record, and, consequently, was not given any restrictions or special supervision. The day after he was admitted he walked to the lavatory on the seventh floor and leaped to his death from an unsecured window. The court concluded that "if Dinnerstein's suicide was reasonably foreseeable, the hospital staff

---

**2.** This is reflected by his failure to attend or participate in treatment sessions, and his unauthorized absences from the hospital.

was clearly negligent in assigning him to an unsupervised and unrestricted room on the seventh floor." *Id.* at 38. Weighing the facts the court concluded that the suicide was reasonably foreseeable, and imposed liability upon the defendant.

■ The facts in the present case are even more persuasive. Gary Smith was not simply depressed, he was a paranoid schizophrenic with a long history of violent behavior. Smith had attempted or threatened suicide on at least three occasions, the last less than a month before his death. He had exhibited impulsive behavior only one week before he was transferred to open facilities, and he was prone to escaping. Based upon this behavior his suicide was reasonably foreseeable and it was negligence to release him to an open facility. This is manifested by the fact that he was not even examined by a psychiatrist before his transfer as the accepted standard of care required.

Defendant argues that persons suffering from paranoid schizophrenia have a right to the least restrictive treatment possible. We do not disagree. However, as the court said in *Dinnerstein* :

"This is not to suggest that every potential suicide must be locked in a padded cell. The law and modern psychiatry have now both come to the belated conclusion that an overly restrictive environment can be as destructive as an overly permissive one. But while we must accept some calculated risks in order to insure the patient's legal rights and provide him with the most effective therapy, we must also admit that errors in judgment do occur and that when they do, medical authorities must assume their rightful share of the responsibility." *Id.* at 38 (footnotes omitted).

The physicians and nurses who treated Gary Smith made a tragic mistake in judgment which eventually cost him his life, and now their employer (defendant) must assume its rightful share of the responsibility.

■ The peculiar circumstances of this case also make difficult the question of damages. Plaintiffs claim to be entitled to 1) loss of financial support the decedent would have contributed to family members, 2) loss of services to the widow, 3) funeral expenses, 4) nurture and guidance to children, 5) loss of income through decedent's life expectancy minus the cost of his personal maintenance reduced to present worth, 6) pain and suffering prior to his death. While as a matter of law this appears to be a correct listing of applicable damages in a case of this kind in Pennsylvania, under the facts of this case, plaintiffs' recovery must be much more limited. There can be no recovery for loss of services and nurture and guidance for two reasons. First, it appears from decedent's own statements upon admission to the hospital that he and his wife were separated. An absent husband and parent can hardly be expected to supply very much in the way of services or nurturing. Second, in decedent's mental state with his poor prognosis, it is unrealistic to believe that he could have been at all beneficial to either his wife or his children in the foreseeable future. Also there can be no recovery for pain and suffering as decedent appears to have died an instant, and therefore virtually painless death.

Thus, the only recoverable damages are loss of income, loss of financial support and funeral expenses. Decedent's only income at the time of his death and his only foreseeable income in the future was that received from the Veterans Administration in the form of disability benefits. This, of course, constituted his only financial contribution to his family. Plaintiffs' contention that Mrs. Smith would have been able to hold a job but for her husband's death is spurious. There is no reason now for Mrs. Smith to refuse to work. Her children are old enough to take care of themselves during working hours, particularly during the school year. Plus, there are many low cost day care centers specifically provided to aid working mothers like Mrs. Smith. And, of course, if decedent's statements concerning his separation from his wife are to be believed, she would not have had him around to help anyway.

■ Plaintiffs' contention that decedent could have, and would have recovered to

earn a decent wage were it not for the negligent treatment he received from the Veterans Administration is rejected. Plaintiffs presented no evidence sufficient to convince the court that this was true. Viewing decedent's medical record it seems that most of the psychiatrists and psychologists who dealt with Gary Smith foresaw little, if any, chance of recovery. And defendant's expert, Dr. L. C. Harris testified that it was likely that decedent would have spent much of the rest of his life in the hospital. Therefore the court must only permit damages in this area based on Gary Smith's lost veterans benefits as there was very little chance he would have ever received any other income. See, e. g., *Phillips v. Ward*, 415 F.Supp. 976 (E.D.Pa.1976).

Plaintiff has suggested that, in order to determine the correct amount of compensation that decedent would have received from the Veterans Administration over the course of his lifetime had he lived, we must assume that such compensation would be increased by an average of 4.19 percent per year, which represents approximately one half of the actual increase over the past several years. While it is within the discretion of the trier of fact to consider potential increases in determining future losses, mere speculation is not permitted. Consequently, an earnings increase factor may be considered only where well-founded evidence of such an increase had been introduced. *Magill v. Westinghouse Electric Company*, 464 F.2d 294 (3d Cir. 1972). Here the only evidence regarding an earnings increase factor came by way of letters from an actuary introduced by stipulation, though not accepted by defendant as fact. These letters fail to provide the court with any basis to believe that the recommended 4.19% figure is accurate now or will be in the future. The only justification seems to be that it is less than recently experienced increases. This strikes the court as speculation of the most blatant nature, and we refuse to accept it as fact. Lacking any other evidence as to decedent's future earnings, we will carry out the present value of his disability compensation over the period of his projected lifetime.

Further, based on testimony to the effect that Gary Smith would have spent much of the rest of his life hospitalized due to his illness, it is the opinion of this court that the cost to his family of his maintenance would have been negligible as he was entitled to such hospital care free of charge from the Veterans Administration. Therefore we will not deduct maintenance costs from plaintiffs' recovery.

Funeral expenses, of course, are includable. 12 P.S. 1604.

## CONCLUSIONS OF LAW

1. Defendant Veterans Administration had a duty to keep Gary Smith on a closed ward on January 17, 1973 in view of his then unstable mental condition.

2. The defendant was negligent in the manner in which it was determined Gary Smith had recovered sufficiently and was no longer impulsive and could be removed from locked ward and given open privileges on January 17, 1973.

3. The defendant was negligent in that a competent psychiatrist did not conduct a thorough, complete examination of Gary Smith to determine if on January 17, 1973 Gary Smith had recovered sufficiently from his mental illness and impulsive acting out to be removed from locked ward and given open privileges.

4. The accepted medical standard of care in the community required the defendant to conduct a thorough complete psychiatric examination of Gary Smith to determine if he had recovered sufficiently from his mental illness and impulsive acting out prior to removing him from the locked ward and granting him open privileges on January 17, 1973.

5. On January 17, 1973, when Gary Smith was removed from the locked ward and given open privileges he was not sufficiently recovered from his mental illness and was impulsive, and a properly conducted psychiatric examination would have determined this fact.

6. The defendant was negligent in removing Gary Smith from the locked ward and granting open privileges to him on January 17, 1973 since Gary Smith had exhibited impulsive behavior at about 3:30 P.M. January 10, 1973 and the standard of care of the medical community at that time would have required of him that he be free of impulsive behavior for at least two weeks, since on prior occasions as noted in defendant's hospital records Gary Smith had been free of impulsive behavior for only 6 days and had thereafter reverted again to impulsive behavior.

7. The act of Gary Smith in stepping before a train on January 17, 1973, which act resulted in his death, was an impulsive act, and should have been protected against.

8. Gary Smith regularly engaged in impulsive behavior while a patient at Coatesville V.A. Hospital in December, 1972 and January 1973, and defendant was on notice of his impulsive acting out.

9. It was common knowledge in the medical community at all times material to this action that the impulsive behavior of Gary Smith carried with it a risk of homicidal or suicidal action on his part.

10. The defendant was negligent in failing to note Gary Smith did not return to the hospital at 4:30 P.M. when his sign out privileges ended. If he had been missed at that time and a prompt search instituted, he might have been found and returned to the locked ward prior to his death at 5:00 P.M. He was not noticed as missing until 5:30 P.M.

11. At all times material to this action the defendant acted by and through duly authorized servants, agents and employees.

12. The plaintiffs are awarded the sum of $11,644.00 representing the past difference in veteran's benefits which would have been received by Gary Smith's family had he not died, and those benefits received subsequent to his death. No reduction is made for decedent's maintenance as this figure would have been negligible due to his frequent hospitalizations.

13. The plaintiffs are awarded the sum of $12,108.00 representing the future difference in veterans benefits received by Gary Smith's family had he lived, and the benefits received subsequent to his death. These benefits are reduced to present value at a rate of 6%.

14. Plaintiffs are awarded the sum of $1500.00 for the funeral bill.

15. Plaintiffs are entitled to judgment against the defendant, United States of America, in the amount of $25,252.00 plus costs.