Humildeflor M. ABILLE, as Administra-
trix of the Estate of Manuel V.
Abille, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. C–78–0486–WWS.

United States District Court,
N. D. California.

Jan. 2, 1980.

James R. Toone, Wesley H. Harris, San Diego, Cal., for plaintiffs.

John M. Kern, Asst. U. S. Atty., San Francisco, Cal., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OF DECISION

WILLIAM W SCHWARZER, District Judge.

This is an action brought under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., arising from the wrongful death of plaintiff's husband, Manuel Abille. Jurisdiction exists under 28 U.S.C. § 1346(b). The law of Alaska, the place where the act or omission complained of occurred, controls. Richards v. United States, 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); United States v. English, 521 F.2d 63, 65 (9th Cir. 1975).[1] The case was tried to the Court, without a jury, on November 13, 14 and 15, 1979. The following shall constitute the Court's findings of fact and conclusions of law.

## FACTS

Manuel Abille was 51 years old at the time of his death. Following retirement from the U. S. Navy in 1965, he attended school in the Philippines until 1970. From 1970 to 1973 he was a merchant seaman. From 1974 until the time of his death, he was a cannery worker employed by Pacific Pearl Seafoods in Kodiak, Alaska. He was survived by his wife, then 41 years old, two daughters aged 17 and 19, and two sons aged 12 and 18.

In September, 1974, Abille had been given a prescription for the drug Reserpine for treatment of high blood pressure. On April 15, 1977, he was taken off the drug by a doctor in Kodiak, Alaska, because of increasing depression, a side effect sometimes induced by Reserpine. Abille had no history of depression or suicidal tendencies prior to taking Reserpine, and the record reflects no other contributing causes of his depression.

As a result of Abille's depression and thoughts of suicide, he voluntarily entered the psychiatric unit of the United States Air Force Hospital at Elmendorf Air Force Base, Anchorage, Alaska, on April 26, 1977. His medical history was taken the next day by Dr. Abel Hipolito, one of the three psychiatrists on the hospital staff, who then became his treating physician. Dr. Hipolito noted, among other things, the following:

"moderate psychomotor retardation—flat affect—relating obsessive preoccupation [with] suicidal ideas for 3 weeks—hopelessness—helplessness—sleep disturbances—[decreasing] energy—self-condemnation."

He stated his conclusions:

"1) Depressive neurosis

2) Hypertension

3) Reactive depression to Reserpine"

All psychiatric patients were assigned status levels in accordance with their condition. As a newly admitted patient, Abille was automatically assigned S–1. In that

1. Plaintiffs may maintain the action under the Alaska Wrongful Death Act, Alaska Stat. § 09.55.580 (1978).

status, he was not allowed to leave the psychiatric unit without a staff escort.

The medical record contains no subsequent notations by a physician while Abille was alive. The nurse's notes for April 27 indicate only that Abille slept for only three hours the preceding night. The notes for April 28 state that Abille had a "brighter affect" and that he said he felt much better and wanted to go home, although the nurse recommended that his treatment "continue as before." On April 29, the notes state in substance that Abille had not slept well, was nervous but less depressed, resisted group therapy and wanted to discuss his problems only with the doctor. The psychiatric technician further noted that Abille was depressed and concerned about his thoughts of suicide. No further progress notes were made.

Beginning not later than Saturday, April 30, the psychiatric nurses on duty in the ward treated Abille as having been assigned S–2 status. It was the understanding of the medical and nursing staff that S–2 patients were permitted to leave the ward escorted by a staff member or patient having S–3 or S–4 status (permitting freer movement), or unescorted upon approval by the duty nurse to go to a specific place in the hospital for a specific purpose. According to a government memorandum,

> "S–2 level was assigned to patients [sic] who had been an inpatient for at least 24 hours, was not considered suicidal . . . did not exhibit behavior that might be harmful to himself or others . . . ."

During the day on Saturday, April 30, the duty nurse permitted Abille to attend mass in the building unescorted. Abille returned without incident. Early on Sunday, May 1, the duty nurse permitted Abille to use his razor to shave and then to go to breakfast unescorted. Shortly after he left the ward,

his body was found on the ground outside the building beneath a window of the Red Cross lounge, an unsupervised facility on the seventh floor of the hospital. He was pronounced dead shortly thereafter. The autopsy report concluded that he had committed suicide.

When the duty nurses permitted Abille to leave the ward unescorted on Saturday and Sunday, they assumed that his status had been changed from S–1 to S–2. Had he still been on S–1, they would not have given him permission. Neither of the nurses could remember how or when the status change was made, or by whom. Dr. Hipolito testified only that he authorized it, but there is no written record that he did. A medical order purporting to change Abille's status did not in fact do so; when the order was prepared on April 29, it contained no reference to S–2 status—that reference was added by a nurse on May 1, after Abille had died.

## LIABILITY

■ The issue before the Court is whether defendant exercised due care in protecting Abille against self-inflicted harm. The duty of a hospital and its staff to exercise reasonable care to protect suicidal patients against foreseeable harm to themselves is well-established. *Stuppy v. United States,* 560 F.2d 373, 375 (8th Cir. 1977); *Dinnerstein v. United States,* 486 F.2d 34, 36–37 (2d Cir. 1973); *Pietrucha v. Grant Hospital,* 447 F.2d 1029, 1033 (7th Cir. 1971); *Bornmann v. Great Southwest General Hospital Inc.,* 453 F.2d 616, 621 (5th Cir. 1971); *Baker v. United States,* 226 F.Supp. 129, 132 (S.D.Iowa 1964) aff'd, 343 F.2d 222 (8th Cir. 1965); *Meier v. Ross General Hospital,* 69 Cal.2d 420, 424, 71 Cal.Rptr. 903, 907, 445 P.2d 519, 523 (1968).[2] As these decisions

---

**2.** Alaska Stat. § 09.55.540 (Supp.1979) allocates the burden of proof in a malpractice action as follows:

(a) In a malpractice action based on the negligence or willful misconduct of a health care provider, the plaintiff has the burden of proving by a preponderance of the evidence

(1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing;

show, that duty exists whether the patient is a voluntary admittee or one who has been involuntarily committed, although its degree and precise character may vary with the circumstances. *Cf. Castillo v. United States,* 552 F.2d 1385 (10th Cir. 1977).

Liability in this case turns on the change in Abille's status from S–1 to S–2. Three questions are raised:

1. Did Dr. Hipolito in fact change Abille's status?
2. If he did change it, did he exercise due care in doing so?
3. If he failed to exercise due care, was his negligence a proximate cause of Abille's death?

1. **Did Dr. Hipolito in fact change Abille's status from S–1 to S–2?**

■ The parties' expert witnesses agreed that the responsibility for determining the appropriate degree of security for a patient rests on the physician, and that is where the Elmendorf hospital's procedures placed it. As described by the government's witnesses, those procedures provided that a patient's status level could be changed only by a physician's medical order or by a therapeutic group or nurse's decision approved by a physician's medical order. If the change was made by a staff member other than the physician, a written medical order signed by the physician had to be issued within 24 hours.

It is not disputed that no proper medical order changing Abille's status was issued here; the April 29 order altered after Abille's death cannot be accepted as a change order. Thus, if Abille's status was changed, it was changed in a manner violating the hospital's procedures. If it was not changed, the action of the nurse permitting Abille to leave the ward unescorted violated the hospital's rules governing S–1 patients and was below the standard of care, according to both parties' expert witnesses.

The evidence which tends to show that Abille's status was changed by Dr. Hipolito is as follows:

a. The psychiatric nurses on duty April 30 and May 1 testified that there had been a staff conference concerning Abille's status, that Abille was shown on the patients' sign-in board as S–2, that he was treated accordingly, and that he would not have been permitted to leave unescorted had he still been S–1.

b. Dr. Hipolito testified on deposition that he ordered Abille's status changed from S–1 to S–2 on April 29.[3]

The evidence which tends to show the contrary is as follows:

c. No proper written order changing Abille's status was ever issued, as required by hospital procedures.

d. In the narrative summary prepared by Dr. Hipolito on May 1, 1977, immediately following Abille's death, he noted that Abille was classified as S–1 upon admission but made no reference to any subsequent change to S–2.

e. The change of status from S–1 to S–2 was written by a nurse after Abille's death on the order issued by Dr. Hipolito on April 29.

Plaintiffs of course have the burden of proving by a preponderance of the evidence

---

(2) that the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and

(3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

(b) In malpractice actions there is no presumption of negligence on the part of the defendant. (§ 1 ch. 49 SLA 1967; am § 34 ch. 102 SLA 1976).

In construing a former version of the statute, the Alaska Supreme Court held that the statutory language established not only the burden of proof, but also the appropriate standard of care. *Priest v. Lindig,* 583 P.2d 173, 175–76 (Alaska 1978); *Poulin v. Zartman,* 542 P.2d 251, 268 (Alaska 1975), *unmodified on rehearing,* 548 P.2d 1299 (1976). There is no claim here that the standard of care applicable to physicians and nurses at the Elmendorf hospital differs from that generally applicable, as described by the parties' expert witnesses. *Cf. Priest v. Lindig,* 583 P.2d 173, 176–77 note 10.

**3.** See note 4, *infra.*

that defendant was negligent, i. e., that Abille was permitted to leave the ward unescorted when his S-1 status had not been changed by a physician. The issue of credibility is a close one. The Court finds and concludes that the evidence tending to show that Dr. Hipolito did *not* change Abille's status from S-1 to S-2 is more persuasive. In this connection, the Court notes that Dr. Hipolito did not appear to testify at the trial. Only his deposition is in evidence. On the issue whether he ordered Abille's status changed, his testimony, given in response to poorly phrased and leading questions, is unpersuasive.[4]

One or more of the nurses may well have believed or assumed in good faith, for some reason not known to the Court, that Abille's status had been changed. The possibility of confusion in this regard was presumably one reason for the hospital's requirement of a written order signed by a physician. Their good faith error, however, in no way relieves defendant of its duty to adhere to the security requirements prescribed by the treating physician for a suicidal patient until duly changed by a physician.

The Court therefore finds and concludes that defendant's nurses were acting below the standard of care when they permitted Abille to leave the ward unescorted while he was classified S-1, his status not having been changed by a physician. Inasmuch as he had been diagnosed to be suicidal, his suicide attempt was a foreseeable risk and must therefore be considered as a proximate result of the negligent act of the nurses.

2. If Dr. Hipolito had changed Abille's status, did he exercise due care in doing so?

In the interest of judicial economy and the complete disposition of this matter, the Court will next consider the alternative theory that Dr. Hipolito changed Abille's status but was negligent in doing so.

According to plaintiffs' expert, Abille remained suicidal until the time of his death. His analysis of the contemporary progress notes of the nurses and psychiatric technicians and of Dr. Hipolito's post-mortem narrative summary shows that symptoms of a suicidal disposition continued to be displayed by Abille and recognized by the staff. He concluded that it would have been below the standard of care to permit Abille to leave the ward unescorted and, consequently, to change his status so that the nurses could permit him to do so.

---

4. At the time the deposition was taken, plaintiffs' counsel may still have been under a misapprehension concerning the significance of various status levels due to the government's failure to provide him with the correct information in timely fashion. He may therefore have failed to appreciate the critical importance of whether Dr. Hipolito did in fact order a change from S-1 to S-2.

In relevant part, the testimony given was as follows:

"Q. [By Mr. Harris] Okay. What is that written on the next line after the date and time? In other words, right under 29 April, it looks like S-2?

A. S-2.

Q. S-2?

A. Uh-huh.

Q. What does that refer to?

A. That the patient was S-2 level at that point.

Q. Now, does that mean that you're ordering the patient at 8:15 on 29 April to be an S-2 level?

A. That's an order, yes.

Q. And that's an order that's written in your handwriting?

A. It's difficult for me to tell you with this xerox, really.

The 50 milligrams, I'm really—I'm saying it because I know the dosage and I've read it before, but it's difficult to see.

Q. No. But—

A. I know what you're saying.

Q. I know it's not the best copy, but S-2 is right here below the date; right?

A. Yes."

"Q. (By Mr. Harris) We do know that you ordered the S-2 status on Friday, April 29th; isn't that true?

A. That's true.

＊　　＊　　＊　　＊　　＊　　＊

On Friday you made a judgment with respect to moving him from S-1 to S-2; is that correct?

A. That's correct." (Tr. 57-58, 61, 68)

That testimony does not persuade the Court that had Dr. Hipolito been carefully cross-examined on this question, he would or could have successfully insisted that he in fact had ordered the change in status to S-2. One compelling reason is that at the trial one of the nurses admitted that he, not Dr. Hipolito, wrote "S-2" on the April 29 order.

Defendant's expert testified that suicidal patients present a spectrum of risk ranging from high to low. He pointed to modern psychiatric practice which favors the least restrictive alternative in protecting psychiatric patients from potential self-harm.[5] Evaluation of the information contained in Abille's hospital records led him to conclude that the risk of suicide presented was sufficiently low to warrant a change to S–2 status.

The Court has no basis for rejecting the opinion of one expert in favor of that expressed by the other. It appears that the appropriate classification of Abille on April 29 was a matter of judgment on which reasonable and competent psychiatrists, acting within the standard of care, could differ.[6] The evidence on this issue being equally balanced, the Court finds that plaintiffs have not sustained their burden.

The fact that Dr. Hipolito *could,* consistent with the standard of care, have changed Abille's status does not, however, establish that the manner in which he changed it was within the standard of care. Both experts agreed that changing Abille's status was a significant medical decision requiring an exercise of judgment. There is in this case no contemporary evidence that Dr. Hipolito in fact exercised his judgment.

Abille upon admission displayed the classic symptoms of a suicidal person, even if he was not a high risk candidate. The expert witnesses of both sides testified that the progress notes reflect no significant change in Abille's condition in the following three days. While the notes report an increase in energy and aggressiveness, this did not necessarily lessen the risk of suicide, for as the patient's energy level increases his ability to carry out his suicidal thoughts increases as well.

There are no progress notes prepared by Dr. Hipolito. If his contacts with Abille between April 27 and May 1 led him to form the judgment that he could, in accordance with the hospital's procedures, be classified S–2 as no longer being "suicidal [or] . . . exhibit[ing] behavior that might be harmful to himself", there is no record to that effect. The only contemporary document prepared by Dr. Hipolito after April 27 is his narrative summary compiled on May 1 following the death. In it he stated that Abille had on admission been "placed on Level S–1 (restricted to the Unit for O&E)", referred to no later change of status, and added:

"Friday, the 29th of April, 1977, was the last day I had talked with or seen the patient. He verbalized his concern about his insomnia, depression and episodic suicidal ruminations."

█ Both parties' experts agreed, and the government now appears to concede, that Dr. Hipolito's failure to keep contemporary progress notes reflecting his exercise of judgment, and the basis for it, was below the standard of care. Dr. Hipolito's deposition testimony, given in response to loosely phrased leading questions and based only on the nurses' and technician's notes and his general recollection, is insufficient to show that, if he did reclassify Abille, he did so in accordance with the standard of care and therefore does not serve to satisfy his duty to maintain adequate records. (Ex. 12, Tr. 71–73, 75–76, 79–80).

The Court therefore finds and concludes that Dr. Hipolito's failure to maintain contemporary notes, orders or other records adequately recording and explaining his action in reclassifying Abille fell below the applicable standard of care.

---

5.  *See, Skar v. City of Lincoln,* 599 F.2d 253, 258 n. 6 (8th Cir. 1979). Even if effective therapy may warrant greater freedom than was afforded under traditional regimes, doctors and hospital staffs are not thereby relieved of their obligation to exercise due care for the patient's safety. *Dinnerstein v. United States, supra,* 486 F.2d at 38; *Lucy Webb Hayes National Training School for Deaconesses and Mission-*

aries v. Perotti, 136 U.S.App.D.C. 122, 125–126, 419 F.2d 704, 707–08 (D.C.Cir.1969).

6.  *See, Baker v. United States, supra,* 226 F.Supp. at 132–33, (Diagnosis of mental patients "with absolute precision and certainty is impossible"); *White v. United States,* 244 F.Supp. 127, 133 (E.D.Vir.1965), *aff'd* 359 F.2d 989 (4th Cir. 1966).

3. Was Dr. Hipolito's negligence a proximate cause of Abille's death?

Alaska law requires plaintiff to prove by a preponderance of the evidence that "as a proximate result of . . . the failure to exercise [the required] degree of care the plaintiff suffered injuries that would not otherwise have been incurred."[7] Alaska law further provides that "there is no presumption of negligence on the part of the defendant" in malpractice cases. On this basis the government argues that since the decision to reclassify Abille S-2 could have been made by a physician acting within the standard of care, Dr. Hipolito's negligence was not a proximate cause of the suicide.

The difficulty with the government's argument is that it assumes that Dr. Hipolito would have reached the same conclusion had he gone about making his decision in the proper fashion. To accept that assumption is to reject the basis for the requirement that a physician make contemporary notes adequately recording and explaining significant medical decisions. That requirement, as explained by the government's expert, is intended to insure that decisions will be carefully made by balancing the therapeutic benefits of greater freedom against the increased risks.[8] The fact that a physician acting within the standard of care *could* have reclassified Abille does not establish that Dr. Hipolito, acting carefully, *would* have reclassified him. The opinion of an expert witness reached solely on the basis of the available hospital records long after the fact is not a substitute for the contemporary professional judgment of the physician administering care to the patient on the scene. Hence the trial expert's opinion provides no assurance that Dr. Hipolito, had he been acting within the standard of care, would have reclassified Abille.

The government's argument, carried to its logical extreme, would bar a plaintiff from recovering for a physician's negligence upon proof that the procedure could have resulted in injury or death even if non-negligently performed. Clearly that is not the law of Alaska. In *Patrick v. Sedwick*, 391 P.2d 453 (Alaska 1964), defendant was charged with having negligently performed a thyroidectomy, based upon evidence of post-operative nerve damage causing plaintiff to experience speaking and breathing difficulty. Defendant showed that such adverse effects are experienced in a small percentage of thyroidectomies in the absence of negligence. The Alaska Supreme Court held defendant negligent for having failed

"to have described accurately and fully in his report of the operation everything of consequence that he did and which his trained eye observed during the operation." (391 P.2d at 457).

It concluded:

"Appellee was the only person who could have prepared a full and accurate report of what was observed and done through the [operation]. We hold that he was obliged to his client to prepare such a report and that he failed to discharge his duty in this respect. We shall not permit the absence of personal recollection or of recorded facts to serve as a defense under the circumstances of this case." (391 P.2d at 457–58).

The reasoning underlying this decision is directly applicable here.[9] The failure to

7. See note 2, *supra*.

8. *Baker v. United States, supra*, 226 F.Supp. at 133–34, (The standard of care, in assessing a patient's suicidal risk, requires a thorough examination, with such diligence and methods of diagnosis as are usually employed by those in the profession; evidenced here by the doctor's lengthy interview and examination of the patient, after which he made his own judgment that circumstances did not justify a closed ward); *Smith v. United States*, 437 F.Supp. 1004, 1011 (E.D.Pa.1977) (Accepted medical standards require a competent psychiatrist to conduct a thorough, complete examination of the patient before removing him from a locked ward, which the physician failed to do in this case).

9. Defendant's reliance on *Skar v. City of Lincoln, supra*, is misplaced. There, the appellate court affirmed the district court's finding that the hospital's negligent failure to confine the patient in a room under constant observation would not necessarily have prevented the injury suffered when plaintiff, while under a

maintain the required records in effect precludes plaintiffs from proving that the doctor's decision was, under the circumstances, negligently made. Thus plaintiffs' attempt to sustain their burden of proving causation can be readily frustrated by the doctor's self-serving trial testimony, in the absence of contemporary records by which to test it.

It is indisputable here that Dr. Hipolito's decision to reclassify Abille substantially increased the risk of a successful suicide attempt.[10] Even if the decision itself could have been within the standard of care, if it was negligently made, that negligence would be a proximate cause of the death. Plaintiffs need not prove causation to a certainty, but only that its existence is more probable than not. Where improper diagnostic techniques have been utilized, it is enough to show that the use of proper procedures could have altered the unfortunate outcome. *Clark v. United States,* 402 F.2d 950, 953 (4th Cir. 1968); *Kingston v. McGrath,* 232 F.2d 495, 499 (9th Cir. 1956). The Court therefore finds and concludes that plaintiffs have sustained their burden of proving causation.

### DAMAGES

The parties differ with respect to Abille's life and work expectancy and the reasonably expectable earnings. Based on the record before it, the Court finds a life expectancy of 21 years (to age 72) and a work expectancy of 10 years (to age 61) to be reasonable. Abille had expected to resume work as a seaman, for whom retirement prior to age 65 is not uncommon. Based on Abille's 1975–1977 earnings record, the Court finds an average annual future income from wages of $8,000 to be reasonable. The parties have stipulated that the inflation factor would be offset by the present value discount.

Abille had been receiving $3,975 per year net as a Navy pension, which was discontinued at his death. His wife then became entitled to an annuity equal to 55 percent of the pension. The annuity is payable as a result of Abille's exercise of an option to accept a lesser life time pension. Hence, it is analogous to life insurance in the sense that it is the product of life time contributions. It should therefore not be an offset against the lost pension (which would have been larger had it been limited to Abille's life with no survivor annuity).[11]

The parties differ over whether the personal consumption allowance should include an element for housing. It is reasonable to assume that the family's housing requirements would have been somewhat greater had Abille survived. While quantification is necessarily inexact, an offset of $1,200 per year for housing and $1,920 for food, clothing and other expenses appears reasonable.

In accordance with Alaska law, income taxes must be deducted from Abille's past earnings, but would not be

nurse's observation, broke into a run and leapt head-first into a window. The injury was caused by running into the window, an injury which confinement in the room would not necessarily have prevented. Here, the death was caused by Abille's jump from a window which could have been prevented had Abille not been reclassified and as a result permitted to go out unescorted.

**10.** *Lucy Webb Hayes National Training School for Deaconesses and Missionaries v. Perotti,* 136 U.S.App.D.C. 122, 129, 419 F.2d 704, 711 (D.C.Cir.1969) (Patient, while being returned under escort after having left closed ward without authority, bolted and jumped out of window. Hospital could be held liable, even though hospital procedures provided for movement of closed ward patients under escort,

since patient's being outside ward without authority and not for a proper purpose created an additional unjustifiable risk of suicide); *Baker v. United States, supra,* 226 F.Supp. at 132, ("The negligence, if any, which was the proximate cause of the patient's injuries arises out of the failure of Dr. Kennedy to properly diagnose the patient as a sufficient suicide risk so as to require closer supervision than was furnished by the immediate assignment of the patient to an open ward.") *See,* also *State v. Guinn,* 555 P.2d 530, 538–39 (Alaska 1976) (Automobile accident case applying Restatement 2d of Torts §§ 430, 431, 433).

**11.** Alaska Stat. § 09.55.548(b) (1978) excludes life insurance from payments from collateral sources which must be offset against an award.

deducted from future earnings. *Beaulieu v. Elliott,* 434 P.2d 665, 673 (Alaska 1967); *Morrison v. State,* 516 P.2d 402, 407 (Alaska 1973). Federal law, however, limits Federal Tort Claims Act awards to compensatory damages. Accordingly income taxes have been deducted where state law so provided, *United States v. English, supra,* 521 F.2d at 71–72, or where the amount involved was so substantial that the failure to deduct taxes would result in a punitive award. *Felder v. United States,* 543 F.2d 657, 667–70 (9th Cir. 1976). The amounts involved here are so small that there is no reason not to apply the Alaska rule on income taxes. *Id.,* 543 F.2d at 670.

Accordingly, plaintiffs' loss of income from the time of death is computed as follows:

| | | |
|---|---|---|
| $8000 x 10 | = | $80,000 |
| 3975 x 21 | = | 83,475 |
| | | $163,475 |

Less
Personal consumption

| | |
|---|---|
| $3120 x 21 = | $65,520 |

Less
Taxes

| | |
|---|---|
| $1310 x 2.5 | 3,275 |
| | $94,680 |

Plaintiffs are also entitled to damages for loss of care, comfort and, in the case of Mrs. Abille, consortium. The evidence shows a closely-knit loving family, shattered by the untimely and tragic loss of a husband and father. No amount of money can adequately compensate for that loss. Having considered all of the relevant facts including the respective ages and marital status of the children, the Court awards damages as follows:

| | |
|---|---|
| Mrs. Abille | $55,000 |
| Rex Abille | 15,000 |
| Vivian Lazo | 10,000 |
| Manuel Abille, Jr. | 10,000 |
| Leilani Lopez | 10,000 |
| | $90,000 |

Judgment shall be entered accordingly, plaintiffs to recover their costs.[12]

IT IS SO ORDERED.

12. The record is replete with evidence of practices in the psychiatric ward at Elmendorf Air Force Base hospital falling below the standard of care. The Court suggests that the record be forwarded to the Secretary of the Air Force for review and appropriate action.