Earlene SCHALES, Administratrix of the Estate of J. M. Schales, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. B–C–77–87.

United States District Court, E. D. Arkansas, N. D.

April 25, 1979.

David Blair, Batesville, Ark., for plaintiff.

A. Doug Chavis, Asst. U. S. Atty., Little Rock, Ark., for defendant.

OPINION

ARNOLD, Circuit Judge, Sitting by Designation.

This is a wrongful-death case under the Federal Tort Claims Act. The plaintiff is administratrix of the estate of Jacob Monroe Schales, Jr., deceased. She claims Mr. Schales's death was caused by the negligence of employees of the United States at the Veterans Administration Hospital in

Little Rock, Arkansas. The case was tried to the Court, sitting without a jury (as is customary in Federal Tort Claims Act cases), in Batesville, Arkansas, on March 4 and 5, 1980. The Court has read in full the three documentary exhibits and five depositions offered in evidence, and now makes its findings of fact and conclusions of law.

### Liability

Mr. Schales, a veteran, was 51 years old. He was admitted to the VA Hospital in Little Rock on December 22, 1975. He had chest pain, shortness of breath, tachycardia (fast heartbeat—his pulse was 140), and had been vomiting (PX 1). According to James B. Searcy, M.D., the admitting physician, Mr. Schales was "very sick" (Searcy dep. 5). On the form for hospital admission (part of PX 1), Dr. Searcy at first checked the box marked "emergent" (which means a patient is dying, see Seracy dep. 6), then crossed it out and marked "urgent," the next most serious classification. Dr. Searcy estimated the likely length of the patient's stay in the hospital as 7 days. The patient was admitted to the general-medicine section of the hospital. Dr. Searcy testified that his symptoms could be consistent with heart problems (dep. 10).

Between 6:30 and 7:00 p. m. that night, Mr. Schales was seen by Michael Crawley, M.D. His symptoms were compatible with "infarction or an incipient cardiac infarction." An infarction is the death of a portion of heart tissue, commonly called a heart attack. An electrocardiogram was done (some times called an EKG, some times an ECG), and it appeared normal to Dr. Crawley (dep. 29). A single EKG, however, may not be a reliable indication that an infarction is not about to happen. Dr. Crawley ordered another EKG done on the morning of December 23 (PX 1;

Crawley dep. 36). It was not done, though good medical practice dictated that the EKG be repeated (Crawley dep. 36).[1] Customary enzyme tests were also done. Three enzymes known as LDH, SGOT, and CPK were tested. Their values were elevated—especially the CPK-a circumstance that is consistent with damage to the heart muscle, though by no means diagnostic in and of itself. Dr. Crawley saw the results of the enzyme test on the morning of the 23d, but he did not then follow up to see if the second EKG had been done (dep. 38).

The picture Mr. Schales presented made myocardial infarction a possibility (Crawley dep. 36). Dr. Crawley's diagnosis was costochondritis, a recognized condition involving pain in the chest that could be brought on by coughing. Mr. Schales had had a cough on the 22d. The enzyme tests could have been repeated to see if the elevated level persisted, and follow-up enzyme tests should have been done based on "standards of medical care observed in this community and in this hospital" (Crawley dep. 39). These follow-up tests,[2] which were not done, might have eliminated the possibility that the enzyme levels were due to injections Mr. Schales had received from a local physician the morning of the 22nd. With this possibility out of the way, the chance that an infarction was occurring or imminent would have appeared greater to Dr. Crawley. Crawley did not review his findings with, or ask that the patient be examined by, a cardiologist (Crawley dep. 50), though a cardiologist was available at all times (de Soyza dep. 7). On the morning of the next day, Christmas Eve, Mr. Schales was discharged. Dr. Crawley summarized the case as follows (dep. 51):

Q Doctor, wouldn't it be accurate to say that in reviewing these records that those things that should have been done

---

1. Defendant objected to Dr. Crawley's being asked whether good medical practice would dictate another EKG. The objection is overruled. Dr. Crawley was qualified to express an opinion. The similar objection at Crawley dep. 51 is also overruled.

2. By this phrase is meant simply a repetition of the enzyme tests after some reasonable time interval. The Court is not finding any fault in the VA's failure to run a more sophisticated test for the enzyme CPK–MB, which is specifically indicative of damage to heart muscle. This refinement was not available in Little Rock in 1975.

to eliminate the possibility of a heart attack by the standards of medical practice observed in this community were not in fact followed in Mr. Schales' case?

A  Yes.

Neil de Soyza, M.D., the VA's staff cardiologist, also testified. He was of the opinion that the patient's CPK was "markedly elevated" (dep. 15). That circumstance would have caused him some alarm as a cardiologist. He would have ordered further diagnostic tests before discharging the patient (dep. 15–16), including a new EKG. "[S]ometimes the evidence of a myocardial infarction takes a couple of days to manifest itself on a [sic] electrocardiogram" (dep. 13). Dr. de Soyza summed up (dep. 17):

> Q  Dr. de Soyza, taking the symptoms this man presented and these enzymes, would good medicine not say that you should rule out whether he had an infarction before he's discharged from the hospital?
>
> A  If these enzyme values were known to me, I would agree with you.

Mr. Schales went home (between Hardy and Ash Flat, Arkansas) on December 24, 1975. He seemed to be in less pain, but on Christmas Day he rubbed his chest constantly and didn't feel well. On the 26th he lay around the house and was again unwell. On the 27th he did not have his normal appetite. These symptoms were more pronounced than his usual state of poor health. His family went out for a while. When they came back, he was on the floor unconscious. The family rushed him to the nearest hospital, 23 miles away in Salem, Arkansas. He died a few minutes after reaching the hospital. Michael Neal Moody, M.D., who saw Mr. Schales at the hospital, stated that he was "in cardiogenic shock" (dep. 3) on arrival. In Dr. Moody's opinion, which the Court accepts, Mr. Schales died of an acute myocardial infarction (dep. 8).

■ The Court finds that the negligence of the United States was the proximate cause of Mr. Schales's death. It is quite true, and triers of fact who have the benefit of hindsight should constantly remind themselves, that medical doctors are not magicians. Diagnostic problems are often imprecise and full of ambiguities. Mr. Schales would have died at some point anyway, as is true of us all. He might have died on December 27 even had he been kept in the VA hospital for further testing and observation. The cause of death might have been some condition wholly unrelated to whatever was wrong on December 22 when the patient was admitted by the VA. All these are possibilities, but they are no more than that. The facts found in this opinion, and particularly the opinions referred to on the part of the various physicians who have been quoted, demonstrate that had reasonably accepted medical procedures been followed, Mr. Schales would probably not have died when he did. If he was suffering, or about to suffer, an infarction on the 22d or 23d (as Dr. Moody's opinion as to the cause of death indicates), further tests would probably have disclosed it. He would not have been discharged from the hospital, and would still have been there on the 27th. Defendant's own expert estimated that his chances of survival might have been 20% better had he been kept in the VA hospital. Time is of the essence in preventing cardiac arrhythmia, and drugs are of some help if available immediately.

The Court has found, based on Dr. Moody's opinion, that the cause of death was myocardial infarction. The next most likely possibility—espoused by plaintiff's expert, Graham A. Vance, M.D.—is a pulmonary embolus, or blood clot. This provisional diagnosis, according to Dr. Vance, whose testimony the Court credits, should also have led to further studies, for example a lung scan, which the VA could have done in Little Rock. No such studies were made, and Mr. Schales was discharged without the pulmonary-embolism theory's being ruled out. Dr. Vance testified, and the Court finds, that whatever was wrong with Mr. Schales on the 22d killed him on the 27th. In either event, whether death was caused by a heart attack or a blood clot, the VA's

failure to follow admittedly reasonable procedures was the proximate cause of Mr. Schales's dying when he did.

*Damages*

Mr. Schales was in bad health and had not worked for some time at the time of his death. He was not earning any money, and no damages are claimed for loss of pecuniary support. Plaintiff claims the following elements of damage: for the estate proper, funeral expenses; for herself as wife, loss of consortium; for the five children, loss of parental care and guidance; and for herself and the children, grief and mental anguish.

■ 1. *Grief.* There is no substantial evidence that Mrs. Schales and her five children grieved more than the normal amount associated with the death of a husband and father. Under Arkansas law, therefore, no damages are recoverable for grief or mental anguish. *E. g., Connell v. Steel Haulers, Inc.,* 455 F.2d 688 (8th Cir. 1972).

■ 2. *Loss of consortium.* Mr. and Mrs. Schales were married 28 years. Mr. Schales was a good husband and father. Although unable to work in his accustomed trade of carpentry, he still did some work around the house. The marriage was close. The Schaleses sang at churches in a quartet with two friends, Leonard and Maxine Smith, both of whom testified at the trial. The Court also had an opportunity to hear and observe the live testimony of Mrs. Schales and each of the five Schales children. The value of a husband's companionship is, of course, beyond price. Any attempt to measure it in dollars can be only an approximation. The most important part of the loss is intangible and ineffable. It lies in that comfort and society that are among the chief reasons for the institution of marriage. The Court awards $50,000.00 for this element of damages.

■ 3. *Loss of Parental Care, Custody and Guidance.* Mr. Schales was close to his children. He participated in sports with them, baseball, fishing, and hunting, when he was able. He was a strong source of

discipline in the family. As Randall Schales, the oldest son, testified, "His word was no, and there were no why nots." Since his death, the younger children have had some problems with discipline that their father would probably have been able to handle. He also helped with school work. The Court makes the following awards for loss of parental care, custody and guidance:

For Wanda Ostermeier, who was 18 years old and a senior in high school, living at home, when her father died, $5,000.00.

For Lindel Schales, who was 14 years old, $10,000.00.

For Phylene Schales, who was 13 years old, $12,500.00.

No awards are made for the benefit of Randall Schales, who was 27 when his father died, for Joyce Snearly, who was not living at home, or for Paula Spurlock, who also had moved away.

■ 4. *Funeral Expense.* The funeral bill (PX 2) is $1,375.05. An offset will be allowed for $400.00 paid by the VA itself for this amount. The defendant also claims offsets for $400.00 paid by burial insurance and $255.00 paid by social security. These offsets are disallowed. Mr. Schales paid for the burial insurance, and he is entitled to the benefits he purchased. Reimbursement from this collateral source does not diminish a judgment in tort. The same is true of social-security benefits, except perhaps to the extent that they are attributable to Government largesse rather than a worker's earnings record. By letter of March 6, 1980, counsel for defendant said he would try to determine the amount of the social-security payment that should be attributed to the Government. The Court has heard nothing further on the subject, perhaps because it is impossible or impractical to compute the answer. *cf. Steckler v. United States,* 549 F.2d 1372, 1378–79 (10th Cir. 1977). The information is more easily accessible to the United States, if it is obtainable at all, than to the plaintiff. Under the circumstances, the judgment for funeral expenses will not be reduced. Plaintiff is entitled to recover $975.05 for this element of damages. See also *Copper v. United*

*States*, 313 F.Supp. 1207, 1212 (D.Neb.1970) (Robinson, C. J.).

5. *Claimed Offset for Periodic Veteran's Benefits.* By letter of March 6, 1980, the United States claims an offset for $7,018.00 paid to Mrs. Schales by the VA since December 1, 1975.[3] This amount apparently represents periodic payments in lieu of disability benefits received by Mr. Schales during his lifetime, which in turn were in lieu of earnings he would have had if not disabled. This offset is denied because the award being made here includes no compensation for lost earnings. *Johnson v. United States*, 271 F.Supp. 205, 211 (W.D. Ark.1967) (Harris, C. J.). There is therefore no double recovery or windfall to the plaintiff.

Judgment will be entered in the total amount of $78,475.05, plus costs of court.

IT IS SO ORDERED this 25th day of April, 1980.

---

**3.** In view of the Court's decision on the merits of this claimed offset, it is unnecessary to consider plaintiff's position that the claim is foreclosed by the Government's not having mentioned it or submitted proof in support of it at trial.