**Garnett P. MORGAN, et al., Appellants,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 79–588.

District of Columbia Court of Appeals.

Argued Sept. 30, 1980.

Decided Aug. 31, 1982.

Harlow R. Case, Washington, D. C., with whom Jack H. Olender, Washington, D. C., was on the brief, for appellants.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D. C., with whom Judith W. Rogers, Corp. Counsel, Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., at the time the brief was filed, and Martin L. Grossman, Asst. Corp. Counsel, Washington, D. C., were on the brief, for appellee.

Before MACK and FERREN, Associate Judges, and GALLAGHER, Associate Judge, Retired.*

FERREN, Associate Judge:

Two major questions are presented in this action for negligence and wrongful death attributable to a police officer's killing and wounding members of his family with his service revolver: (1) whether the trial court erred in granting the defense motion for judgment notwithstanding the verdict (judgment n. o. v.) on the ground that the plaintiff-appellants failed to establish the applicable standard of care; and (2) whether the trial court erred in granting the defense motion to reduce the wrongful death judgment on the ground that a widow's pension was not a collateral source. We conclude that the trial court erred in granting both motions; we therefore reverse.

I.

Plaintiffs Garnett Pinkney Morgan, John Keith Morgan, Mary Pinkney, and Joseph Pinkney each sued the District of Columbia, the Chief of the Metropolitan Police Department, Lieutenant John R. Bowles, Jr., and Officer John Morgan, Jr. for negligence proximately causing specified injuries to them. Garnett Morgan and John Keith Morgan sought damages for physical injuries, medical expenses, loss of earnings, and loss of future earnings. Mary Pinkney and Joseph Pinkney asserted negligent infliction of emotional distress. Mary Pinkney also sued as the personal representative of the estate of Elton Pinkney for wrongful death.

---

* Judge GALLAGHER was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on February 27, 1981.

Before trial, plaintiffs voluntarily dismissed their actions against all defendants except the District of Columbia.

At trial, the plaintiffs presented the following evidence. Garnett Morgan testified that she married John Morgan, Jr. (Morgan) in 1966. Morgan was an officer with the Metropolitan Police Department, and Garnett Morgan was a speech pathologist. The couple had two children, John Keith and Lamont.

Garnett Morgan testified that in July 1974 John Morgan beat her, causing bruising of her eye and swelling on one side of her face. In August 1974 John Morgan threatened his wife with a gun. Garnett Morgan described this event as follows:

> It was about a month later, during August, when he came in early one morning. The kids and I were asleep, and he snatched me up out of the bed by my nightgown, and he put the gun to my head and told me that if I didn't leave within the next couple of days, that he would kill me; and after doing that, he sat in the chair in the bedroom, still having the gun, and eventually dozed off. Once he dozed off, I got both kids together, and left the house and went to my mother's.

When Garnett Morgan reached her parents' home, she called Seventh District Headquarters, to which Officer Morgan was assigned. She spoke with Captain Francis J. Tiernan, her husband's captain. Garnett Morgan testified that she informed Tiernan of the July beating and of that morning's gun threat:

> I explained to him [Tiernan] what had happened that night with him [John Morgan] putting the gun to my head and threatening to kill me, and I explained everything to him. I explained to him about my eye having been injured not long before that, that he had beaten me, and that I was afraid and that I had left and I was at my mother's....
>
> * * * * * *
>
> ... I ... explained to Captain Tiernan that I was afraid for my life, I was afraid that he really would kill me, and I asked

him if he would make him just stay away from me.

Garnett Morgan testified that Captain Tiernan replied, "I can't put a man out of his house, ... [but] I will talk with him." Tiernan called back later that evening and said that he had talked with John Morgan and thought it might be best if the couple separated. Garnett Morgan and the children stayed at her parents' home for a few days and then one day, after Captain Tiernan had advised her that Officer Morgan was at work, she moved their belongings from the marital home to an apartment.

On the afternoon of November 7, 1974, John Morgan arrived at his wife's apartment and threatened to force his way inside. Garnett Morgan let him in but suggested that he leave immediately. John Morgan grabbed her and choked her into unconsciousness. When she regained consciousness several hours later, she found herself alone on the bed with her hands and feet tied and her mouth gagged. Although she succeeded in freeing herself, John Morgan heard her movements and returned to the bedroom.

John Morgan forced his wife into his car and drove her around Prince Georges County and Southeast Washington. When a park police cruiser pulled him over for running a red light, Morgan told his wife that if she said anything he would kill both her and the officer. He unsnapped his holster. The officer gave Morgan a ticket and drove away. John Morgan then drove to a park, where he threatened Garnett Morgan, "If I kill you here, no one would ever find you," and unsuccessfully attempted to drag her out of the car.

Garnett Morgan testified that at last her husband drove to her parents' home. The Morgan children were there, and John Morgan began to put coats on the children, preparing to take them with him. When Garnett Morgan objected, he said, "I'm taking the children with me, and if you say one word, I'll kill your father where he's sitting." As soon as John Morgan left with the children, his wife broke down and called

the police. Two uniformed District of Columbia police officers responded to the call. When Garnett Morgan described the events of that day, the officers called for an official from the precinct to which John Morgan was assigned.

Lieutenant John R. Bowles, Jr. arrived at the Pinkney house, and Garnett Morgan described to him the July beating, the August gun threat, and the threats and injuries of that day. Lieutenant Bowles told the other officers that he could handle the situation and they could leave. He then asked Garnett Morgan for a written statement. While she dictated a statement to her brother, Joseph Pinkney, Lieutenant Bowles called John Morgan at home and asked him to report to the precinct. Morgan called back and said that he was going to bring the children to the Pinkney home before reporting in.

Garnett Morgan testified that when her husband drove up, Lieutenant Bowles went outside to meet him. John Morgan carried two-year-old Lamont to the house; four-year-old John Keith and Lieutenant Bowles followed behind. As they walked into the house, Garnett Morgan stood up and walked toward the children. John Morgan said, "I told you so," pulled his revolver from underneath his jacket, and shot her twice.

Joseph Pinkney testified that immediately after shooting Garnett Morgan, her husband turned and shot Lieutenant Bowles. (John Keith had been hit by one of the shots aimed at his mother.) Joseph Pinkney took cover behind the kitchen door and asked John Morgan several times to drop the gun. Joseph Pinkney testified that as he spoke, his father, Elton Pinkney, descended the stairs. John Morgan shot Elton Pinkney (his father-in-law). Joseph Pinkney fled the house.

Mary Pinkney, Garnett Morgan's mother, testified that she was out of John Morgan's sight behind a room divider during the shooting but that afterwards Morgan discovered her there. He put the gun to her

back and shoved her out of the door with his son Lamont. The police found them hiding in the cellar well.

Elton Pinkney died. Garnett Morgan, John Keith Morgan, and Lieutenant Bowles were wounded. John Morgan surrendered to the police and was subsequently convicted of first degree murder and two counts of assault with intent to kill while armed. This court affirmed his convictions. *Morgan v. United States*, D.C.App., 363 A.2d 999 (1976), *cert. denied*, 431 U.S. 919, 97 S.Ct. 2187, 53 L.Ed.2d 231 (1977).

Captain Tiernan testified at trial that "general orders" require him, as precinct captain, to conduct an investigation when anyone—including a police officer's spouse—reports a threatened, improper use of an officer's service revolver. In such circumstances, Tiernan must obtain written statements from everyone concerned and submit a report and recommendation to his superior officers. Tiernan admitted that Garnett Morgan informed him in August 1974 that John Morgan had beaten her, but denied she told him that Morgan had threatened her with a gun.

At the close of the plaintiffs' case,[1] the court granted a directed verdict for the defense against Mary Pinkney and Joseph Pinkney with respect to their claims for negligent infliction of emotional distress. The court also granted a directed verdict for the District of Columbia with respect to the alleged negligence of Lieutenant Bowles on the scene. The court, however, denied the District's motion for directed verdict premised on an argument that expert testimony was required to establish the standard of care for control and supervision of police officers.

The defense recalled Garnett Morgan and Joseph Pinkney, questioned Garnett Morgan as to whether there were violent episodes in her marriage before 1974 and examined Pinkney about the details of the shootings. The defense also called two new

---

1. Plaintiffs also had called an economist, Joseph Tryon, as an expert witness on the issue of the loss to Mary Pinkney attributable to

Elton Pinkney's death. Tryon estimated Mary Pinkney's loss to be $75,678; he did not offset her loss by the amount of her widow's pension.

witnesses, Lieutenant Bowles and Lieutenant Bruce H. Swank. Lieutenant Swank testified that he had been John Morgan's commanding officer for two years, and that Garnett Morgan had called him several times with complaints that her husband had beaten her. Lieutenant Bowles' testimony corroborated the plaintiffs' account of the shootings, except that he (like Captain Tiernan) denied he had ever been told that John Morgan had threatened his wife with his gun.

In rebuttal, plaintiffs reexamined Garnett Morgan, Mary Pinkney, and Joseph Pinkney, and called one new witness, Officer Robert A. Walker. Officer Walker testified that he was one of the uniformed officers who had responded to the Pinkney home on November 7, 1974. Walker stated that he told Lieutenant Bowles about the gun threat against Garnett Morgan before Bowles instructed him to leave.

At the close of all the evidence, defense counsel again moved for a directed verdict. The court denied the motion but granted plaintiffs' motion for a directed verdict barring a finding of contributory negligence by Garnett Morgan.

The jury returned a verdict in favor of Garnett Morgan for $90,000; in favor of John Keith Morgan for $15,000; and in favor of Mary Pinkney as personal representative of the estate of Elton Pinkney for $75,678. *See* note 1 *supra.* The court entered judgment accordingly on April 20, 1979, *nunc pro tunc* to March 6, 1979.

On March 16, 1979, the District of Columbia moved for a judgment notwithstanding the verdict as to all plaintiffs and, alternatively, for a reduction of the wrongful death judgment in favor of Mary Pinkney from $75,678 to $45,946. On April 20, 1979, the court granted both motions. It reduced the wrongful death judgment to $48,862 and then granted a judgment notwithstanding the verdict as to all plaintiffs. Plaintiffs timely noted this appeal. The District did not file a cross-appeal.

## II.

■ We first consider appellants' contention that the trial court erred in granting the judgment n. o. v. In reviewing the trial court's action, "this court must view the evidence and all reasonable inferences in the light most favorable to the party who obtained the jury verdict; we may affirm only if no juror could reasonably reach a verdict for the opponent of the motion." *Marcel Hair Goods Corp. v. National Savings & Trust Co.,* D.C.App., 410 A.2d 1, 5 (1979); *see Faniel v. Chesapeake & Potomac Telephone Co.,* D.C.App., 404 A.2d 147, 150 (1979). We therefore must accept, as did the trial court, Garnett Morgan's testimony that she informed Captain Tiernan of her husband's gun threat against her in August 1974. The question, then, is whether a reasonable jury could conclude that the Police Department's failure to act after receiving a report of an officer's gun threat constituted negligence proximately causing appellants' injuries.

A. The trial court determined that no reasonable juror could have found that the Police Department's conduct constituted negligence proximately causing appellants' injuries. The court stated in its Memorandum Order that appellants had shown that the Police Department owed them a duty. The court ruled, moreover, that "the issues raised in this case do not present the type of 'technical questions' which require expert testimony" to establish the standard of care. The court nevertheless concluded that appellants failed to establish a standard of care "which the jury could use as a benchmark in evaluating the Department's conduct."[2] The trial court accordingly rea-

---

2. Specifically, the trial court said that appellants' case suffered from the following "deficiencies":

1. [Appellants] failed to establish the standard of care for determining whether or not a police officer should be removed from the police department, or his weapon taken away from him, based upon the allegation of his spouse that he had threatened her with his weapon during a domestic dispute.

2. [Appellants] failed to establish whether police department personnel practices would permit the officer's superiors to consider prior non-violent derelictions of duty by the

soned that because appellants did not establish the applicable standard of care, they necessarily failed to show that a breach of that standard proximately caused their injuries.

■ The elements of a negligence action are: (1) a duty, owed by the defendant to the plaintiff, to conform to a certain standard of care; (2) a breach of this duty by the defendant; and (3) an injury to the plaintiff proximately caused by the defendant's breach. W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 30 (4th ed. 1971). *See Morrison v. MacNamara,* D.C.App., 407 A.2d 555, 560 (1979); *Baker v. District of Columbia Transit System, Inc.,* D.C.App., 248 A.2d 829, 831 (1969).

■ As to the first element, the trial court determined that the Police Department owed appellants a duty to use reasonable care to protect them from unreasonable risk of harm. The court characterized the Department's duty as a special duty owed to members of the Morgan family to protect them from a threatened crime, *citing Rieser v. District of Columbia,* 183 U.S. App.D.C. 375, 563 F.2d 462 (1977), *vacated in part and reinstated in part,* 188 U.S.App. D.C. 384, 580 F.2d 647 (1978) (en banc) (parole officer owed duty to tenants of apartment complex to warn apartment manager of parolee-employee's history of violent crime). *But see Warren v. District of Columbia,* D.C.App., 444 A.2d 1 (1981) (en banc) (victim's request for help from police and reliance on promised aid does not create special duty). We agree that the Police Department owed a duty to appellants, but

we conclude that this duty is properly characterized as a general duty, owed to the public at large, to use reasonable care in supervising and controlling police officers and their service revolvers. *Marusa v. District of Columbia,* 157 U.S.App.D.C. 348, 351, 484 F.2d 828, 831 (1973) ("government has a duty to minimize the risk of injury to members of the public that is presented by [its] policy [of requiring police officers to carry service revolvers at all times]"); *Carter v. Carlson,* 144 U.S.App.D.C. 388, 398, 447 F.2d 358, 368 (1971) ("District of Columbia as a corporate entity has a duty to supervise, train and control its police officers"), *reversed in part, sub nom. District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973); *see District of Columbia v. White,* D.C.App., 442 A.2d 159 (1982) (referring to existence of cause of action against police department for negligent supervision of officers); *District of Columbia v. Davis,* D.C.App., 386 A.2d 1195, 1199–1201 (1978) (same).[3]

■ Although the trial court acknowledged the Police Department's duty, the court concluded that appellants failed to establish a central aspect of that duty: the appropriate standard of care. To the contrary, however, "[t]he law of negligence generally does not acknowledge differing standards or categories of care, but requires an adherence to a uniform standard of conduct: that of reasonable care under the circumstances." *Morrison, supra* at 560; *Matthews v. District of Columbia,* D.C.App., 387 A.2d 731, 734 (1978); *District of Columbia Transit System, Inc. v. Carney,* D.C. App., 254 A.2d 402, 403 (1969).[4] The appli-

---

officer, for which he had already been punished, in determining whether or not action should be taken against the officer upon new allegations of violent conduct.

3. [Appellants] failed to establish the nature and extent of the investigation referred to by Captain Tiernan, the length of time such investigation would take, and the status of the police officer and the restrictions which may be placed on him, if any, during the course of the investigation.

4. [Appellants] failed to establish what ultimate penalties the police department may impose if the allegation of threatened use of a

service revolver in the course of a domestic dispute were confirmed.

3. This responsibility is not unique to the Police Department; the duty to supervise and control employees is common to all employers. *See International Distributing Corp. v. American District Telegraph Co.,* 186 U.S.App.D.C. 305, 308–09, 569 F.2d 136, 139–40 (1977); RESTATEMENT (SECOND) OF AGENCY § 213 (1958). *See also* Annot., 10 A.L.R. 1087 (1921) (liability of master for injury inflicted by servant with firearms).

4. "Reasonable care under the circumstances" is not, however, the standard in this jurisdic-

cable standard of care in this case, therefore, is "reasonable care under the circumstances," as in every ordinary negligence case.[5]

■ A plaintiff's case, however, can fail on the standard-of-care issue if "the subject dealt with is so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman." *Davis, supra* at 1200. In such a case, the plaintiff will fail to establish the standard of care if the jury does not receive guidance from experts in determining what constitutes reasonable care under the circumstances. *See Hughes v. District of Columbia,* D.C.App., 425 A.2d 1299, 1303 (1981) (expert testimony or other evidence was required to show that prison security system was not operated with reasonable care); *Matthews, supra* at 734–35 (same); *Davis, supra* at 1200–01 (expert testimony was required as to whether police weapons safety training program was operated with reasonable care); *Marusa v. District of Columbia,* No. 1766–71 (D.D.C. July 8, 1974) (expert testimony was required as to whether program of evaluation of police officers for psychiatric problems and alcoholism was reasonable). Discipline of police officers, however, is not "a matter which laymen are incapable of intelligently evaluating without the assistance of expert testimony." *Davis, supra* at 1201. The trial court correctly ruled that expert testimony was not necessary in this case.

■ B. Having found that appellee, through its Police Department, owed appellants a duty to use reasonable care in supervising and controlling its police officers, a jury reasonably could have determined—addressing the second element of negligence—that appellee committed a breach of this duty by failing to take any action after being notified of Officer Morgan's gun threat. That finding would have been especially reasonable given Captain Tiernan's acknowledgment that "general orders" required a written report and recommendation by the precinct captain whenever there is a reported threat of improper use of an officer's service revolver. *See International Distributing Corp. v. American District Telegraph Co.,* 186 U.S.App.D.C. 305, 308–09, 569 F.2d 136, 139–40 (1977) (jury could find that employer was negligent in supervising employees); *Rieser, supra* 183 U.S.App.D.C. at 390–92, 563 F.2d at 477–79 (jury could find that parole officer was negligent in supervising parolee); *Kendall v. Gore Properties,* 98 U.S.App.D.C. 378, 382–90, 236 F.2d 673, 677–81 (1956) (jury could find that landlord was negligent in failing to investigate and supervise employee).

In summary, a jury reasonably could have found that the Police Department failed to exercise reasonable care, since it should have realized that its failure to act "involve[d] an unreasonable risk of harm to another through the" intentional or criminal conduct of Officer Morgan. RESTATEMENT (SECOND) OF TORTS § 302B (1965) (Risk of Intentional or Criminal Conduct).[6]

tion for cases involving a landowner's liability for injury to trespassers. *See Washington Metropolitan Area Transit Authority v. Ward,* D.C.App., 433 A.2d 1072, 1073–74 (1981); *Holland v. Baltimore & Ohio R.R. Co.,* D.C.App., 431 A.2d 597 (1981) (en banc) (both holding that landowner has duty to trespasser not to inflict willful or wanton injury and to warn of "hidden engine of destruction").

5. The jury could have defined "reasonable care under the circumstances" to mean that the Department was obligated to abide by its own "general orders" and regulations. *See Gueory v. District of Columbia,* D.C.App., 408 A.2d 967, 971 (1979); RESTATEMENT (SECOND) OF TORTS § 285(b) (1965). Or, the jury could have defined "reasonable care under the circumstances" to mean that the Department was

required to act as common sense dictated, regardless of what Department regulations required. *See Turner v. American Motors General Corp.,* D.C.App., 392 A.2d 1005, 1007 (1978); *Burch v. Amsterdam Corp.,* D.C.App., 366 A.2d 1079, 1085–86 (1976). In either case, however, the standard of care remains "reasonable care under the circumstances."

6. According to the RESTATEMENT, *supra* § 302B comment *e:*

There are, however, situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others. In general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes

C. The question remains: could a reasonable jury have found that appellee's breach proximately caused appellants' injuries?[7]

Traditionally, the courts of this jurisdiction have defined proximate cause as

" 'that cause which, in natural and continual sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred.' ... The injury must be the 'natural and probable consequence of the negligent or wrongful act, and * * ought to have been foreseen in the light of the attending circumstances.' " Whether it is or not is ordinarily a question of fact for the jury. [*Wagshal v. District of Columbia,* D.C.App., 216 A.2d 172, 175 (1966) (citations omitted).]

*Accord, Ceco Corp. v. Coleman,* 441 A.2d 940, 944 (1982); *Lacy v. District of Columbia,* D.C.App., 424 A.2d 317, 319–20 (1980); *Spar v. Obwoya,* D.C.App., 369 A.2d 173, 178 (1977); *St. Paul Fire and Marine Insurance Co. v. James G. Davis Construction Corp.,* D.C.App., 350 A.2d 751, 752 (1976).

 This definition incorporates both "cause-in-fact" and "policy" elements. *Lacy, supra* at 319–21. As to the first, we recently cautioned that, in order to impose liability, the trier must find that the partic-ular actor's conduct was a "substantial factor" in bringing about the harm. *Lacy, supra* at 319–21; RESTATEMENT, *supra* § 431(a); *see Graham v. Roberts,* 142 U.S. App.D.C. 305, 308, 441 F.2d 995, 998 (1970).[8] A mere possibility of harm attributable to the conduct is not enough.

 The second, "policy" element is more complex. Even when an actor's conduct is a substantial factor in bringing about harm, there nonetheless may be a variety of circumstances that justify "relieving the actor from liability because of the manner in which his negligence has resulted in the harm." RESTATEMENT, *supra* § 431(b); *see* note 8 *supra. Accord, Lacy, supra* at 320 n.5. On the other hand, this "policy" element does not necessarily limit liability to occurrences that are clearly foreseeable at the time of the actor's conduct. (In this connection, our traditional definition of proximate cause, *see Wagshal, supra* at 175, is ambiguous; the "natural and probable consequence" of wrongful conduct need not always "have been foreseen," *id.,* except in the broadest sense permitted by a retrospective look). We acknowledged in *Lacy, supra,* therefore, that the law is best served by adhering to a policy that the actor shall be liable for all the "harm he actually caused," foreseeable or not, unless the "chain of events appears 'highly extra-

---

the duty to protect him against such intentional misconduct; or where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account. The following are examples of such situations.

\* \* \* \* \* \*

E. Where the actor entrusts an instrumentality capable of doing serious harm if misused, to one whom he knows, or has strong reason to believe, to intend or to be likely to misuse it to inflict intentional harm. Illustration:

11. A gives an air rifle to B, a boy six years old. B intentionally shoots C, putting out C's eyes. A may be found to be negligent toward C.

7. The "deficiencies" in appellants' case noted by the trial court, *see* note 2 *supra,* although labeled standard-of-care issues, actually relate to the question of proximate cause. The court concluded that appellants' case was defective because their evidence did not indicate what

action police regulations required after initial investigation of a gun threat, and thus their evidence did not indicate what would have happened in this case if the Department had followed its regulations. The question for the jury, however, was not whether the Department's failure to follow its regulations proximately caused appellants' injuries, but whether the Department's failure to follow *reasonable* investigatory and disciplinary procedures (which may or may not track Department regulations) proximately caused those injuries. *See* note 5 *supra.*

8. The RESTATEMENT, *supra* § 431 provides:

The actor's negligent conduct is a legal cause of harm to another if

(a) his conduct is a substantial factor in bringing about the harm, and

(b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm.

ordinary' in retrospect." *Id.* at 320–21 (quoting Reporter's Notes to RESTATEMENT (SECOND) OF TORTS § 433, 3 app., at 129 (1966)); *see* RESTATEMENT, *supra* § 435(2).[9]

■ In sum, under proximate cause analysis, an actor whose "conduct is a substantial factor in bringing about harm," *id.,* § 435(1); *see id.,* § 431(a), shall be liable in negligence (1) for harm foreseeably attributable to his or her conduct, and (2) for unforeseeable harm attributable to his or her conduct unless, "after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have" done so. *Id.* § 435(2); *see* note 9 *supra.*

■ In a particular instance, the critical policy issue in determining proximate cause may be the question of an unforeseeable "intervening force." *Id.* § 441.[10] Such a force may become a concurrent legal cause, or it may be so unforeseeable—yet immediate and pronounced—that the actor's negli-gent conduct, though still a substantial causative factor, should not result in the actor's liability. In that case, the intervening force itself will become a "superseding" legal cause that exonerates the original actor. *Id.* § 440.[11]

■ We traditionally have called a superseding legal cause an "efficient intervening cause," *Wagshal, supra* at 175, and have stressed that, by definition, it can "not have been reasonably anticipated." *St. Paul Fire and Marine Insurance Co., supra* at 752. "If the danger of an intervening negligent or criminal act should have reasonably been anticipated and protected against, the defendant will be held responsible for the damages which result despite the entry of another act in the chain of causation." *Id.* Accord, *Ceco Corp., supra* at 944; *Spar, supra* at 178.[12]

■ D. Given this analytic framework we turn to the first issue, cause in fact: whether a reasonable jury could find that

---

**9.** The RESTATEMENT, *supra* § 435 provides:

(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

(2) The actor's conduct may be held not to be a legal cause of harm to another where *after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.* [Emphasis added.]

**10.** The RESTATEMENT, *supra* § 441, defining intervening force, provides:

(1) An intervening force is one which actively operates in producing harm to another after the actor's negligent act or omission has been committed.

(2) Whether the active operation of an intervening force prevents the actor's antecedent negligence from being a legal cause in bringing about harm to another is determined by the rules stated in §§ 442–453.

**11.** The RESTATEMENT, *supra* § 440, defining superseding cause, provides:

A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.

**12.** The RESTATEMENT, *supra,* affords two avenues of analysis for the question whether a police officer's use of a service revolver against his family is a superseding cause precluding liability of a police department that provided the gun, had notice of the officer's threats, and negligently failed to take action. In *Spar, supra* at 178, we acknowledged the rule of § 448:

The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, *unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.* [Emphasis added.]

The other provision—of particular relevance here—is § 449:

If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.

*See* RESTATEMENT, *supra* § 302B & comment *e,* at note 6.

the Police Department's failure to respond with reasonable care to Garnett Morgan's report of the gun threat in August 1974 was a substantial factor in bringing about the injuries and death resulting from Officer Morgan's use of his service revolver three months later, in November 1974. We answer yes.

*First,* the jury could have found that the Department, if acting reasonably, would have investigated Garnett Morgan's report to Captain Tiernan of her husband's gun threat; that an appropriate investigation would have included interviews with Morgan's immediate superiors, as well as inspection of his personnel file; and that the investigation would have revealed that Garnett Morgan had notified Lieutenant Swank about a recent assault by her husband and that the Department itself had charged Officer Morgan over the years with many serious "derelictions of duty," including lying.[13]

*Second,* therefore, the jury reasonably could have found that the Department, if acting reasonably, should have credited Garnett Morgan's report of the gun threat

rather than her husband's denial; should have instituted disciplinary proceedings against Morgan; and at least should have disarmed if not suspended him during those proceedings.[14]

*Third,* the jury then reasonably could have found that during the three-month period between the report of the gun threat and Officer Morgan's shooting of his relatives, the Department, in the exercise of reasonable care, had only one course of action—a disciplinary proceeding—with three possible consequences by November 1974: exoneration of Morgan, a finding of guilt of some offense, or a proceeding still pending, with Morgan disarmed. Only in the first instance would the death and injuries possibly still have occurred through use of a service revolver, and in that case Morgan's trial and exoneration would have absolved the Department of negligence.[15] Absent a disciplinary proceeding, therefore, the facts warranted a jury finding that the Department's negligence in failing to respond to Garnett Morgan's report of the gun threat was a substantial factor in bringing about the injuries and death attributable to Offi-

13. Morgan was charged with assault the year he joined the police force (it was dismissed on a *nolle prosequi*). In 1969, two of Morgan's superior officers recommended that his employment be terminated after his probationary period because he had left his post and then lied about doing so. In 1970, the Police Trial Board found Morgan guilty of five derelictions of duty, including another instance of lying to his superior officer. The Board recommended removing Morgan from the force, but he was returned to duty after an appeal. Officer Morgan was on six months' probation because of yet another dereliction at the time of the shootings in this case. *Compare Argonne Apartment House v. Garrison,* 59 App.D.C. 370, 373, 42 F.2d 605, 608 (1930) (employer was not liable for failing to conduct adequate investigation of employee's background where there was no evidence that further investigation would have disclosed relevant facts tending to show he was a thief).

14. Garnett Morgan's story was corroborated by two facts known to the Department: She left the marital home immediately after the threat and moved into a new apartment, after checking with Captain Tiernan to be sure her husband was at work. Furthermore, as Lieutenant Swank knew, John John Morgan had assaulted

her before. In contrast, John Morgan's credibility was undercut by the fact that he had a substantial disciplinary record and had lied repeatedly to his superiors. The jury reasonably could have found that the Department should have accepted Garnett Morgan's account of the gun threat and thus should have instituted disciplinary action against Officer Morgan, and at least disarmed him in the meantime.

15. On the facts here, the possibility of exoneration cannot serve to break the causal chain since such speculation should not benefit the wrongdoer. More specifically, "if the victim *might* have been saved by a precaution which the defendant negligently omitted, the omission is deemed to have caused the harm, even though it is not possible to demonstrate conclusively that the precaution would in fact have saved the victim." *(Harry J.) Hicks v. United States,* 368 F.2d 626, 632 n.3 (4th Cir. 1966) (emphasis in original) (where negligent medical procedures were used, defendant is answerable "[i]f there was any substantial possibility of survival"). *Accord, Kirincich v. Standard Dredging Co.,* 112 F.2d 163 (3d Cir. 1940) (drowning, non-swimmer deck hand might, though not necessarily would, have survived if seamen on board had thrown a proper life buoy instead of a one-inch line).

cer Morgan's use of his service revolver in November 1974.

■ E. In applying, next, the policy element of legal cause analysis, we conclude that the jury reasonably could have found that the chain of events after Garnett Morgan's report of the gun threat was not "'highly extraordinary in retrospect.'" *Lacy, supra* at 321 (citation omitted); RE-STATEMENT, *supra* § 435(2); *see* note 9 *supra.* Specifically, Morgan's criminal act was not a superseding (*i.e.,* "efficient" intervening) cause. To the contrary, it was reasonably foreseeable under circumstances known to the Department that Morgan "might avail himself of the opportunity" to carry out his threat with the gun. RESTATE-MENT, *supra* § 448; *see* note 12 *supra; see also Graham v. M & J Corp.,* D.C.App., 424 A.2d 103, 107 (1980); *Spar, supra* at 178; *(Hazel M.) Hicks v. United States,* 167 U.S. App.D.C. 169, 184, 511 F.2d 407, 422 (1975). Indeed, given the foreseeable possibility that John Morgan would carry out his threat with a gun which the Department itself had provided, there is all the more reason why a jury would not find a superseding legal cause attributable to Morgan's own conduct. *See* RESTATEMENT, *supra* § 302B & Illustration 11, at note 6 *supra; id.* § 449, at note 12 *supra.*

In sum, a reasonable jury could have found that appellee committed a breach of duty to appellant by failing to take action after receiving notice of Officer Morgan's gun threat, and that the injuries and death were the "natural and probable consequence" of that negligence. *Wagshal, supra* at 175. The trial court, therefore, erred in granting the defendant's motion for a judgment n. o. v.[16]

### III.

Appellants assert that the trial court erred in reducing the amount of the wrongful death judgment from $75,678 to $48,-862.[17] The court did so on the ground that the amount Mary Pinkney recovered from the District should be reduced by the amount of her widow's pension from the federal government, since the latter represented continued "earnings" of her husband.[18] That is to say, in the trial court's words, the widow's pension was "actually the same annuity that her husband received but in a deferred and reduced form."

■ Appellants challenge this ruling because, under the "collateral source rule" in this jurisdiction, "an injured person may usually recover in full from a wrongdoer regardless of anything he may get from a 'collateral source' unconnected with the wrongdoer." *Hudson v. Lazarus,* 95 U.S. App.D.C. 16, 18, 217 F.2d 344, 346 (1954); *see Albano v. Yee,* D.C.App., 219 A.2d 567, 568 (1966); *Radilla v. Kerns,* D.C.App., 155 A.2d 517, 519 (1959); RESTATEMENT (SECOND) OF TORTS § 920A(2), Comments *b & c* (1979). Retirement and disability pensions may constitute "collateral sources." *See Jacobs v. H. L. Rust Co.,* D.C.App., 353 A.2d 6, 8

16. Since we conclude that the trial court erred in granting the defense motion for judgment n.o.v. as to the Department's allegedly negligent supervision and control of Officer Morgan, we need not reach the question whether the court erred in directing a verdict for the defense with respect to Lieutenant Bowles' alleged negligence at the scene.

17. The court reduced the judgment from $75,-678 (the amount projected by appellants' economist without crediting the widow's pension against Mrs. Pinkney's claimed loss) to $48,862 ($45,946, representing the economist's estimate less the amount of the widow's pension, plus $2,916 for funeral expenses).

18. In a wrongful death action, "damages shall be assessed with reference to the injury resulting from the act, neglect, or default causing the death, to the spouse and the next of kin of the deceased person ...." D.C.Code 1978 Supp., § 16–2701 (recodified as D.C.Code 1981, § 16–2701). *See Semler v. Psychiatric Institute,* 188 U.S.App.D.C. 41, 44, 575 F.2d 922, 925 (1978) ("[P]roper recovery under [the Wrongful Death] Act is based on the pecuniary benefits that the statutory beneficiaries might reasonably be expected to have derived from the deceased had he lived." (footnote omitted)); *Runyon v. District of Columbia,* 150 U.S.App.D.C. 228, 231, 463 F.2d 1319, 1322 (1972) ("The proper recovery under the Wrongful Death Act is principally the amount of financial loss to the spouse and the next of kin." (footnote omitted)).

(1976); *Bradshaw v. United States,* 143 U.S. App.D.C. 344, 355–56, 443 F.2d 759, 770–71 (1971); *Capital Products v. Romer,* 102 U.S. App.D.C. 279, 280, 252 F.2d 843, 844 (1958) (per curiam).

The trial court asked the proper question: Does the widow's pension constitute the continued "earnings" of the decedent, so that the widow suffers no "loss of earnings"? *See Schales v. United States,* 488 F.Supp. 33, 38 (E.D.Ark.1979); *St. Louis, I. M. & S. R. Co. v. Maddry,* 57 Ark. 306, 307–310, 21 S.W. 472, 472–74 (1893). The court erred, however, in concluding that the widow's pension necessarily constituted continued "earnings" simply because the decedent had begun to receive a pension before his death.[19] Although this fact is relevant in determining the nature of the pension received by the widow, it is not dispositive. *See Frazier v. Ewell Engineering & Contracting Co.,* 62 So.2d 51, 53 (Fla.1953) (holding that deduction of widow's pension from judgment for lost earnings was error where decedent had been receiving pension at death but reduced payments to widow were "received by her in her own right"); *St. Louis I. M. & S. R. Co., supra* 57 Ark. at 309, 21 S.W. at 473 (holding that instruction to jury to disregard widow's pension was proper in case in which decedent had been receiving pension at death, but distinguishing case in which decedent's full pension would survive and become payable to widow). *But see Smith v. Manchester Insurance & Indemnity Co.,* 299 So.2d 517, 522–23 (La.App.), *writ denied,* 302 So.2d 617 (1974) (holding, without discussion of nature of pension, that where decedent was receiving pension at death, widow's pension should be credited against award for lost earnings).

◼ The most important fact to be considered in defining the nature of Mary Pinkney's widow's pension is not merely the fact that Elton Pinkney was receiving a pension at his death but, rather, as the trial court itself acknowledged, the additional fact that "Mrs. Pinkney's benefits under the Civil Service Survivorship Annuity were made possible entirely by her husband who elected to take a reduction in his retirement annuity and thereby create the survivorship benefits . . . ." Mrs. Pinkney's pension is thus comparable to the widow's pension at issue in *Abille v. United States,* 482 F.Supp. 703 (N.D.Cal.1980) (applying Alaska law), where the decedent, by virtue of accepting a reduced pension during his lifetime, had enabled his widow to receive a survivor's annuity equal to 55% of the pension. The court held:

> The annuity is payable as a result of [the decedent's] exercise of an option to accept a lesser life time pension. Hence, it is analogous to life insurance in the sense that it is the product of life time contributions. It should therefore not be an offset against the lost pension (which would have been larger had it been limited to [the decedent's] life with no survivor annuity). [*Id.* at 710 (footnote omitted).]

*Cf. Phelan v. Motor Vehicle Indemnity Corp.,* 52 Misc.2d 341, 343, 275 N.Y.S.2d 873, 877 (1966) (because "widow would not have been entitled to this pension were it not for her husband's money contributions," pension payments are analogous to "payments from a collateral source or payments for which the injured person or deceased has paid premiums"). We conclude that Mary Pinkney's widow's pension is less akin to continued earnings than to insurance payments generated by contributions (here, her husband's voluntary reduced pension benefits during his lifetime). The trial court

---

**19.** The court dismissed as "inapposite" cases which held that a widow's pension should not be credited against a claimed loss, but in which the decedent was not receiving pension benefits at his death. *See Mazzolini v. Kalamazoo County,* 228 Mich. 59, 199 N.W. 648 (1924); *Phelan v. Motor Vehicle Accident Indemnification Corp.,* 52 Misc.2d 341, 275 N.Y.S.2d 873 (1966), *aff'd,* 31 A.D.2d 757, 298 N.Y.S.2d 669 (1969); *Cady v. City of New York,* 14 N.Y.2d 660, 249 N.Y.S.2d 868, 198 N.E.2d 901 (1964); *Geary v. Metropolitan St. Ry. Co.,* 73 A.D. 441, 77 N.Y.S. 54 (1902); *Wasicek v. M. Carpenter Baking Co.,* 179 Wis. 274, 191 N.W. 503 (1923). *But cf. Keel v. Compton,* 120 Ill.App.2d 248, 256 N.E.2d 848 (1970) (widow's pension should be credited against award even where decedent was not receiving pension at death).

erred in concluding that the widow's pension was not a collateral source and thus should not have reduced the wrongful death judgment.

## IV.

We hold that the trial court erred in (1) granting the defense motion for judgment n. o. v. against all appellants as to the Police Department's negligent supervision of Officer Morgan and in (2) reducing the amount of the wrongful death judgment entered in favor of Mary Pinkney. Accordingly, we reverse and remand to the trial court with directions to reinstate the jury verdicts as to all appellants.[20]

*So ordered.*

GALLAGHER, Associate Judge, Retired, dissenting:

I believe the trial court was correct in granting the motion for a judgment notwithstanding the verdict against the District of Columbia. It was in August 1974, after Officer Morgan had threatened to kill his wife and dozed off in a chair with a gun in his hand, that his wife departed and reported the incident to the precinct captain. The captain later phoned the wife and said he had talked to Officer Morgan and the captain thought it might be best if the couple separated.

Three months later (November 7), Officer Morgan appeared at his wife's apartment and shortly thereafter choked her into unconsciousness. Then came the series of incidents related in the majority opinion, culminating in the tragic shooting death and series of three shooting injuries.

I do not find the necessary factual ingredients of proximate cause present, especially given the long span (over three months) between the wife's report to the police and the criminal acts.

This decision has the potential to bring about undeserved verdicts against the city with great financial loss to what is apparently regarded as the "deep pockets" of the District of Columbia. The "employer" burden placed here on the District of Columbia as a matter of law will invite dangerous abuse.

Tragic as the death and injuries were, I do not think they are civilly ascribable to the District of Columbia government. Employers should not be called upon to suffer liability for crime committed by employees in their private lives.

---

**20.** Appellants also assert that the trial court erred in directing a verdict for the defense as to Mary Pinkney's claim for negligent infliction of emotional distress. (Joseph Pinkney did not appeal the directed verdict as to his emotional distress claim.) The rule in this jurisdiction, however, is that "there can be no recovery for negligently caused emotional distress, mental disturbance, or any consequence thereof, where there has been no accompanying physical injury." *District of Columbia v. Smith,* D.C.App., 436 A.2d 1294, 1296 (1981); *see Garber v. United States,* 188 U.S.App.D.C. 172, 578 F.2d 414 (1978); *Parrish v. United States,* 123 U.S.App. D.C. 149, 357 F.2d 828 (1966) (per curiam); *Perry v. Capital Traction Co.,* 59 App.D.C. 42, 32 F.2d 938, *cert. denied,* 280 U.S. 577, 50 S.Ct. 31, 74 L.Ed. 627 (1929). Mary Pinkney claimed that she was entitled to recover damages for emotional distress (and consequent elevated blood pressure and "nerves") which she suffered as a result of being in the house when the shootings occurred. Although she testified that John Morgan placed his gun at her back and shoved her outside, she did not allege that his action caused her physical harm. Since Mrs. Pinkney claimed no physical injury accompanying her emotional distress and its consequences, the trial court did not err in directing a verdict for the defense as to her emotional distress claim.